788 P.2d 375

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**David K. WATLEY,
Defendant–Appellant.**

**No. 10539.**

Court of Appeals of New Mexico.

Dec. 28, 1989.

Certiorari Denied March 7, 1990.

Hal Stratton, Atty. Gen., Margaret B. Alcock, Asst. Atty. Gen. Santa Fe, for plaintiff-appellee.

Jacquelyn Robins, Chief Public Defender, Jonathan A. Abbott, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

## OPINION

MINZNER, Judge.

The convictions in this case arose out of a series of incidents in Albuquerque's Northeast Heights area during January through September 1986. Convicted of various counts of aggravated burglary, kidnapping, and criminal sexual penetration with a deadly weapon in connection with five separate victims, defendant appeals, raising twelve issues. He contends the trial court erred in (1) precluding certain alibi testimony as a sanction for late disclosure; (2) admitting serological evidence that the police department allowed to deteriorate; (3) failing to instruct the jury regarding the state's failure to preserve the serological evidence; (4) running his parole periods consecutive to one another; and (5)

failing to suppress evidence and testimony obtained as a result of the stop and search of his vehicle. He also contends (6) there was prosecutorial misconduct in referring to hair comparisons as "identical" and error in admission of hair comparison evidence and that the trial court erred in (7) denying his motion for severance; (8) admitting certain identification testimony; (9) admitting certain testimony from a court services employee; and (10) failing to excuse two jurors for cause. Finally, he contends (11) that there was not sufficient evidence to support his convictions; and (12) that this court should reverse on the basis of cumulative error. Other issues listed in the docketing statement but not briefed are abandoned. *State v. Fish*, 102 N.M. 775, 701 P.2d 374 (Ct.App.1985).

Since the application of law to the facts concerning many issues is clear, only part of this opinion warrants publication. The remainder of the opinion, which is incorporated by reference, will be a memorandum opinion and may not be cited as precedent. We discuss issues (1) through (6) in the portion of the opinion that will be published. We discuss issues (7) through (12) in the portion of the opinion that is not to be published. For the reasons set out below, we affirm defendant's convictions but reverse the judgment and sentence and remand for entry of an amended judgment and sentence.

### (1) Preclusion of Alibi Testimony

The prosecutor and defense counsel interviewed Dennis Baca on the evening of the tenth day of trial. During the interview Baca stated that he had attended a March 15, 1989 party in Albuquerque and that defendant was also present at the same party. Baca stated that he had only recently recollected this information. On the morning of the eleventh day of trial, the state moved to exclude Baca's alibi testimony. Defense counsel argued that the testimony should be allowed because both the state and defendant found out about the testimony at the same time. Defense council stated defendant would not object if the court granted a recess in order

to allow the state sufficient time to respond to this testimony. The prosecutor objected to permitting defendant to call Baca as an alibi witness on the grounds that Baca had been on defendant's witness list for about one month and that he was not listed on an alibi notice, including the updated version; therefore, his testimony should be prohibited. The prosecutor also informed the trial court that the state would be required to re-interview all of the witnesses who were at the party, approximately ten to fifteen people, because Baca's testimony made them all potential alibi witnesses, and it would also seek to recall the victim as a rebuttal witness. The prosecutor indicated that it could take a substantial amount of time for the state to prepare to respond to Baca's testimony if the trial court allowed the alibi testimony.

The trial court ruled that Baca would not be allowed to offer alibi testimony, noting that the rules requiring notice of alibi were designed to exclude this sort of "eleventh hour problem." Defense counsel made an offer of proof outside the presence of the jury during which Baca testified that in the early morning of March 15, 1986 he was at a party at which defendant was present. Baca further testified that he left the party shortly before sunrise and defendant was still present at the party.

It is clear that a trial court does have discretion to preclude defense testimony as a sanction for failure to comply with a demand for notice of alibi. SCRA 1986, 5–508(C). In deciding whether to admit alibi evidence when a proper notice has not been served by the defendant, the trial court "should balance the potential for prejudice to the prosecution against the impact on the defense and whether the evidence might have been material to the outcome of the trial." *McCarty v. State,* 107 N.M. 651, 653, 763 P.2d 360, 362 (1988). In considering the potential for prejudice to the prosecution, the trial court must take into account not only the prejudicial effect of noncompliance on the immediate case, but also the necessity to enforce the rule to preserve the integrity of the trial process. The trial judge should consider whether

noncompliance was a willful attempt to prevent the state from investigating necessary facts. Ultimately the court must weigh the resulting prejudice to the state against the materiality of the precluded testimony. *Compare Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (holding that the compulsory process clause of the sixth amendment does not create an absolute bar to the preclusion of a defense witness's testimony as a sanction for violating a discovery rule requiring disclosure of witnesses) and *McCarty v. State* (applying *Taylor* to preclusion under the notice-of-alibi discovery rule).

Defendant relies on *McCarty* to support his contention that the trial court abused its discretion in excluding Baca's alibi testimony, but *McCarty* is distinguishable. In *McCarty* the prosecutor admitted that the state was not prejudiced by the late disclosure because the prosecutor had spoken to each of defendant's two witnesses about particular times that defendant was with them. After discussing the issue of prejudice, the prosecutor in *McCarty* even offered to withdraw her objection to the admission of the alibi testimony. In holding that it was error to exclude such testimony, the supreme court noted that the state was cognizant of the particular times defendant's witnesses would testify that McCarty was present with them. The court found that "under the facts and circumstances of this case it would be unreasonable to weigh the balance against the defendant." *Id.* at 655, 763 P.2d at 364.

In the case at hand, the state was not aware that Baca would give alibi testimony and indicated to the trial court that it would be prejudiced in that it would have to re-interview ten to fifteen witnesses in order to adequately respond to Baca's alibi testimony. A continuance would have been necessary to complete these interviews. The issue arose two days after the state had rested its case. Under these circumstances, the trial court was entitled to conclude that granting the request would prejudice the state.

In addition, the alibi testimony excluded was of questionable probative value.

Baca's testimony was that defendant was at a party shortly before sunrise on the morning of March 15. The victim testified that the perpetrator woke her in her apartment at 4:29 a.m. that day, and that he remained in her apartment for about an hour. Defendant's proffered testimony did not exclude the possibility that defendant may have temporarily left the party and returned just before sunrise.

The notice of alibi rule is designed to enhance the search for truth in the criminal trial by insuring both the defendant and the state ample opportunity to investigate certain facts crucial to the determination of guilt or innocence. *State v. Smith*, 88 N.M. 541, 543 P.2d 834 (Ct.App.1975). Under the facts of this case, the purpose of the rule would have been frustrated if the trial court had allowed the alibi testimony at the late point in time at which defendant sought to offer it. Based on the above, we cannot say the trial court abused its discretion in excluding Baca's alibi testimony.

## (2) & (3) Serological Evidence

Defendant objects to the admission of serological evidence showing that defendant's blood type and the genetic marker phosphoglucomutase (PGM) were consistent with the blood type and PGM found in vaginal swabs and semen stains on clothing and bedding collected from several of the victims. He contends that the procedures used by the Albuquerque Police Department allow deterioration to occur in serological evidence prior to testing, and the use of more stringent procedures to preserve serological evidence might have resulted in test data inconsistent with defendant's PGM, thereby eliminating him as a suspect. He further contends that the failure to use the most up-to-date procedures to preserve serological evidence denied him due process and a fair trial.

■ The United States Supreme Court recently addressed a similar issue in a case where the failure of police department officials to refrigerate semen-stained clothing of a rape victim resulted in the later inability to perform serological tests on the stains because the semen had deteriorated into too small a quantity to make a valid comparison with defendant's blood type. *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). The Supreme Court recognized in *Youngblood* that it was held that the good or bad faith of the state is irrelevant when the state fails to disclose to defendant material exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). New Mexico has followed the approach set out in *Brady* for determining whether deprivation of evidence is reversible error. *See State v. Chouinard*, 96 N.M. 658, 634 P.2d 680 (1981), *cert. denied*, 456 U.S. 930, 102 S.Ct. 1980, 72 L.Ed.2d 447 (1982); *State v. Lovato*, 94 N.M. 780, 617 P.2d 169 (Ct.App.1980). The Supreme Court now has held, however, that a different result may apply where the evidence before the court indicates only that the state failed to preserve potentially useful evidentiary material, which could have been subjected to testing, where there is a possibility that the test results would have exonerated the defendant. *Arizona v. Youngblood*. In such a situation, unless defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law. *Id.* In the present case, defendant does not contend there was bad faith on the part of the police in storing the evidence in question. We hold the trial court did not err in admitting the serological evidence. *Id.; See also Colon v. Kuhlmann*, 865 F.2d 29 (2d Cir.1988).

■ Defendant then argues that the trial court erred in rejecting his tendered instructions, modeled after an instruction given in *Youngblood*, instructing the jury that if it found the state had destroyed or lost evidence, they might infer that the true fact existed against the state's interest. The majority in *Youngblood* did not rely on the giving of this type of instruction as a basis for its holding; however, Justice Stevens, concurring in the judgment of the Court, noted that the fact of the instruction tended to support a conclusion that the trial had not been fundamentally unfair. In this case, the trial court

was not required to give such an instruction under the reasoning set out by the majority in *Youngblood,* nor are we persuaded that the absence of the instruction rendered defendant's trial fundamentally unfair.

The instructions requested by defendant single out one item of evidence and comment on how the jury is to consider it. Our supreme court in adopting our Uniform Jury Instructions has indicated that in the absence of good cause, no instructions (beyond those otherwise provided) are to be given concerning the weight or effect to be accorded certain types of evidence. The Commentary to UJI Crim. 14–5011 indicates that such an instruction is not to be given to the jury. *See* SCRA 1986, 14–5011 (jury not to speculate on whether the testimony or evidence not produced would be favorable or unfavorable to party who failed to present evidence of testimony). The philosophy behind the uniform jury instructions is to avoid singling out a particular item of evidence for special treatment and to allow counsel and not the court to make argument to the jury. *See State v. Torres,* 99 N.M. 345, 657 P.2d 1194 (Ct.App.1983). Therefore, we hold the trial court did not err in rejecting defendant's tendered instructions.

*(4) Stacking of Parole Periods*

█ Defendant contends, and the state agrees, that the trial court erred in imposing a ten-year parole period. In the case of consecutive sentencing, the parole period of each offense commences immediately after the period of imprisonment for that offense, and such parole time will run concurrently with the running of any subsequent basic sentence then being served. *Brock v. Sullivan,* 105 N.M. 412, 733 P.2d 860 (1987). Accordingly, we reverse the judgment and sentence and remand for entry of an amended judgment and sentence which sets out a parole period consistent with *Brock. See Gillespie v. State,* 107 N.M. 455, 760 P.2d 147 (1988) (reaffirming *Brock* and holding that where defendant serves consecutive sentences, parole period commences after completion of imprisonment term for each offense rather than at completion of entire sentence); *see also* NMSA 1978, § 31–18–15(C) (Repl.Pamp.1987).

*(5) Stop and Search of Defendant's Vehicle*

At approximately 3:00 or 4:00 a.m., Officer DeQuack had just received a report of an incident involving criminal sexual penetration in the immediate area he was patrolling, together with a report that a person wearing a ski mask had been seen running north on Sellars Street, when he observed defendant's truck traveling north on Sellars Street. The report also indicated the suspect was Hispanic. DeQuack stopped defendant's truck, testifying that he was looking for anything out of the ordinary, a person walking, any vehicles, or possibly a witness. DeQuack testified that he approached defendant's truck, asked defendant for his driver's license, asked him to step out of the truck, and patted him down for safety purposes. Officer O'Hea arrived at the scene while defendant was getting out of his truck.

Both officers testified that defendant was wearing a gray sweatshirt and jeans, seemed very nervous, and was sweating profusely. Defendant was asked what he was doing in the area. He responded that he had been driving through Los Altos Park to meet someone and that they had not shown up, so he was just driving around and did not know how he had ended up in that area. DeQuack testified that he knew Los Altos Park was closed that night because he had been by there earlier and both entrances were locked. Also, he touched the hood of defendant's truck and found that it was cold. DeQuack testified that he asked defendant if it was okay for him to look in the truck, and defendant responded "yes." DeQuack observed a beige knit cap, a large screwdriver, and black ski gloves inside defendant's truck. The officers requested a further description of the suspect and were informed that the suspect was described as a Spanish male; therefore, they allowed defendant to leave because he did not match the description they received.

■ In appropriate circumstances and in an appropriate manner a police officer may approach a person for purposes of investigating possible criminal behavior, even though there is no probable cause to make an arrest. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Thus, an officer may stop and detain a citizen if the officer has a reasonable and articulable suspicion that the person stopped is or has been involved in criminal activity. *See State v. Galvan*, 90 N.M. 129, 560 P.2d 550 (Ct.App.1977); *see also United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), *cert. denied*, 455 U.S. 923, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982). An investigatory stop requires an assessment that yields a particularized suspicion, one that is based on the totality of the circumstances and that raises a suspicion that the particular individual being stopped is engaged in wrongdoing. *United States v. Cortez*. If officers have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion. *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). In making a determination of reasonable suspicion, " 'the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts.' " *United States v. Sokolow*, —— U.S. ——, ——, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1, 12 (1989) (*quoting Illinois v. Gates*, 462 U.S. 213, 243–244, n. 13, 103 S.Ct. 2317, 2335, n. 13, 76 L.Ed.2d 527, 552, n. 13 (1983)). In the present case, DeQuack was in the immediate area of a recently-reported rape, and he had been informed that someone reported having seen a person wearing a ski mask running north on Sellars when he observed defendant's truck traveling north on Sellars. Considering defendant was stopped in the early morning hours a short distance from the area where an alleged crime had been committed and where a man had been seen running toward the vicinity where defendant was stopped, DeQuack could reasonably have concluded that defendant may have been involved in the commission of the reported offense.

Defendant argues that because the officers observed that he was a black man, while the description given by the victim was of an Hispanic man, no reasonable suspicion existed to believe that defendant was involved in the reported crime. Under the circumstances of this case, we believe it was entirely reasonable for DeQuack to have stopped the only person he saw on Sellars, notwithstanding the description of the offender as Hispanic, in view of the fact that the person seen running north on Sellars was wearing a ski mask.

Defendant was stopped in the vicinity of a recently reported crime at an hour in the morning when no other vehicles or individuals were present. DeQuack also had reason to believe defendant was not being truthful in his explanation regarding what he was doing in the area since DeQuack knew that Los Altos Park was not open that night, and despite defendant's statement that he had been driving around, the hood of his truck was cold. Under these circumstances it was not improper for the officer to stop defendant briefly in order to investigate. *See People v. Juarez*, 35 Cal. App.3d 631, 110 Cal.Rptr. 865 (1973).

*(6) Hair Comparison Evidence and References to Such Evidence*

Defendant filed a pre-trial motion to exclude hair comparison testimony which the trial court denied. Melissa Hughes was qualified at trial as an expert in the field of hair and fiber analysis. She testified that in her expert opinion, hair samples collected from clothing or bedding of the victims, or from the victim's person in the cases of J.T., B.B., S.S., and J.K., were consistent in microscopic characteristics with hair samples taken from defendant. In explaining how hair comparisons are done, Hughes noted that she lines up the two hairs being compared under a stereoscopic microscope and looks at them for consistencies. She testified that in doing a hair comparison she is "looking for the twin hair or the hair that looks exactly like the reference collec-

tion," and she oftentimes lines up two hairs:

> [W]hen they are so absolutely consistent as to be what I call a twin, some people call them identical hair, and line them up in the microscope so you don't realize it is, indeed, two hairs, then have people look at them and I had done this in these cases.

Hughes testified that she had not ever had occasion to examine two hairs, each from a different person, and found those two hairs to be consistent with each other. On cross-examination Hughes noted that she was testifying regarding the results of her hair comparisons, she was not telling the jury that defendant committed the crimes with which he had been charged, and she did not know how many other people have hair that is consistent with the hair on defendant's head.

Defendant raises two arguments with respect to the hair comparison evidence presented at trial. He contends first that prosecutorial misconduct occurred when the prosecutor referred to the hair samples as identical or microscopically identical during closing argument. Defendant also contends it was error to admit evidence of the comparison of hair samples because it was unduly prejudicial, thereby violating his right to due process and a fair trial. The portion of this issue pertaining to prosecutorial misconduct was not raised in the docketing statement. Defendant moved to amend the docketing statement to include this issue in his memorandum in opposition, which motion was held in abeyance pending submission of the case to a panel. We deny defendant's motion to amend because there is no record to support this issue, as set out in greater detail below. The portion of this issue pertaining to the admission of hair comparison evidence was originally raised in the docketing statement and is therefore properly before this court.

This case was assigned to the general calendar on July 6, 1988. This court granted defendant's first motion for designation of supplemental transcript in October and November 1988. The transcript was filed in district court on November 23, 1988 and December 6, 1988. The transcript was filed in this court on December 8, 1988 and December 22, 1988. Defendant filed a second motion for designation of supplemental transcript on March 8, 1989, seeking to have the state's closing argument transcribed. A period of approximately three months elapsed from the filing of the transcript to the filing of the second motion for supplemental transcript. Defendant had ample time to check the accuracy of the transcript pursuant to SCRA 1986, 12–211(C)(4). Accordingly, in light of the fact that the motion was filed eighty-eight days into defendant's briefing time, defendant's second motion for designation of supplemental transcript was properly denied. Insofar as defendant moves this court to reconsider its denial of his motion for supplemental transcript, we decline to do so for the reasons stated above.

■ Insofar as defendant contends it was error to admit Hughes' testimony regarding hair comparisons because it was unduly prejudicial, we are unpersuaded. The fact that evidence prejudices defendant is not grounds for its exclusion. *State v. Hogervorst*, 90 N.M. 580, 566 P.2d 828 (Ct. App.1977). If defendant is contending the mere use of the words "microscopically consistent," "consistent," "twin," or "identical" was prejudicial, we disagree, in light of the fact that the jury had before it testimony explaining the meaning of hair comparison results in terms of establishing identity. *See State v. Golladay*, 78 Wash.2d 121, 470 P.2d 191 (1970), *overruled on other grounds, State v. Arndt*, 87 Wash.2d 374, 553 P.2d 1328 (1976) (En Banc). Moreover, such evidence is relevant even if the expert is unable to opine that the hair found on the victim or at the scene of the crime was from defendant. *See State v. Kersting*, 292 Or. 350, 638 P.2d 1145 (1982). Therefore, we cannot say the trial court abused its discretion in admitting Hughes' testimony.

*Conclusion*

For the foregoing reasons we affirm defendant's convictions. We reverse the judgment and sentence and remand for re-

sentencing and entry of an amended judgment and sentence and for the imposition of parole periods consistent with this opinion.

IT IS SO ORDERED.

DONNELLY and ALARID, JJ., concur.