2 P.3d 856

2000-NMSC-018

STATE of New Mexico, Plaintiff–Respondent,

v.

JASON L., a child, Defendant–Petitioner.

No. 25,806.

Supreme Court of New Mexico.

May 23, 2000.

Phyllis H. Subin, Chief Public Defender, Nancy M. Hewitt, Assistant Appellate Defender, Santa Fe, for Petitioner.

Patricia A. Madrid, Attorney General, Ralph E. Trujillo, Assistant Attorney General, Santa Fe, for Respondent.

## OPINION

MINZNER, Chief Justice.

{1} Defendant Jason L., a minor, appeals from a decision of the New Mexico Court of Appeals reversing a district court's order suppressing a concealed weapon. *See In re Jason L.,* 1999–NMCA–095, 127 N.M. 642, 985 P.2d 1222. We granted Defendant's petition for certiorari because his appeal raised two important issues: (1) when was he seized for purposes of his constitutional protections, *see* U.S. Const. amend. IV; N.M. Const. art. II, § 10, and (2) was his seizure justified? The Court of Appeals apparently assumed that Defendant's Fourth Amendment rights were not implicated until he was searched and that reasonable suspicion supported that search. *See Jason L.,* 1999–NMCA–095, ¶ 18, 127 N.M. 642, 985 P.2d 1222. On this record, however, we believe the district court found Defendant had been detained prior to the search and concluded that he was detained without justification, contrary to his Fourth Amendment rights. We hold that the Court of Appeals erred in overturning the district court's determinations. We

therefore reverse the Court of Appeals and affirm the district court's order.

## I.

{2} Defendant was arrested and charged with unlawful possession of a handgun contrary to NMSA 1978, § 30–7–2.2 (1994). At the suppression hearing, the State presented the testimony of the two arresting officers, Officer McDaniel and Officer Jordan. McDaniel testified first and as follows.

{3} At approximately 10:00 p.m. on Thursday, July 17, 1997, the officers were returning from an unrelated call when they noticed two boys walking eastbound on 13th Street toward Washington in Roswell. No relevant activity had been reported in the area that evening. The officers proceeded past Defendant and his companion, Filemon M., and observed them. McDaniel believed their actions were suspicious. He stated that "they kept looking back over their shoulders to see where I was at or if I was gonna' turn." "Both boys looked at [us] . . . [however] the one who kept looking at [me] was [Filemon M.]." McDaniel admitted that his police report only noted that Filemon M. was looking back at him. The boys never stopped walking; instead they continued forward, looking back over their shoulders. McDaniel noticed Filemon M. "messing with the left side of his waistband [as] if he was adjusting something or messing with something underneath his big, heavy coat." Next, McDaniel turned off his headlights, parked behind a wall, and positioned himself behind a fence where he was not visible. McDaniel was suspicious because the boys had not traveled as far as he expected they would have had they continued walking at their previous speed.

{4} Based on these observations, McDaniel decided to approach the two boys. He returned to his vehicle and stopped them on the street without engaging emergency equipment. After approaching the boys, McDaniel believed they continued to act suspiciously. He based this belief on the fact that Filemon M. continued to fuss with his waistband and appeared to be trying to keep himself separated from the officers by positioning Defendant between them. McDaniel

testified that he did not observe any criminal activity. Upon contact, McDaniel asked the boys what they were doing. The boys responded they were "just walking," and McDaniel thought this was a good answer. Filemon M. continued to fuss with the left side of his waistband, which led McDaniel to ask an additional question. He asked the boys whether they had any knives or weapons on them. At first the boys did not respond; after McDaniel repeated the question, the boys eventually answered, "No."

{5} McDaniel then asked Filemon M. to open his jacket. At this point, McDaniel described Filemon M.'s jacket as a big, baggy coat. McDaniel did not tell Filemon M. that he did not have to unzip his jacket. Nothing was visible when Filemon M. unzipped his jacket. McDaniel proceeded to pat down Filemon M. and felt a firearm in his waistband. The firearm was identified as a .22 caliber pistol. After McDaniel secured the weapon, Filemon M. stated he had another weapon. McDaniel searched Filemon M. and found another gun located on the right side of his belt. The officers then searched Defendant and found a .22 caliber firearm located in the front waistband of his pants under his coat.

{6} Jordan testified as follows. Filemon M. kept looking back at the police officers. He wore a "big, white jacket." Jordan thought it was peculiar that Filemon M. was wearing a jacket in the middle of July and reaching for his side as he walked but commented, however, that maybe it was cold or "it could have been cooler than I thought it was." He also noted that the boys were walking very slowly.

{7} The two officers pulled up behind the boys and McDaniel either said, "Can we talk to you for a minute?" or, "Come here." Filemon M. was acting very nervous. He kept trying to move behind Defendant, who appeared to be more willing to talk with the officers. Jordan did not remember McDaniel asking the boys if they had weapons or guns. When asked if the conversation occurred, Jordan answered that it might have occurred after McDaniel asked Filemon M. to open his jacket. McDaniel asked Filemon M. to open

his jacket and Filemon M. reacted by reaching for his waistband. At that point, McDaniel grabbed Filemon M.'s hand and again asked him to open his jacket. Both officers saw the weapon in plain view in Filemon M.'s waistband and both yelled, "Gun!" pursuant to their training. After the officers saw the gun, they handcuffed Filemon M. and secured the weapon. Jordan searched Filemon M. to see if he was carrying any other weapons. During the search of Filemon M., Defendant was standing in front of the patrol car "like Officer McDaniel asked him to do." After two guns were found on Filemon M., McDaniel searched Defendant. At no point did Jordan observe any suspicious conduct by Defendant.

{8} The State charged Defendant and Filemon M. with unlawful possession of a handgun. At the conclusion of the hearing, the district court granted Defendant's motion to suppress stating:

> [T]he most recent case dealing with this, [*State v. Eli L.*, 1997–NMCA–109, 124 N.M. 205, 947 P.2d 162].... [held] that we will not dispense with the requirement of individualized particularized suspicion. In this particular case, both the officers testified that ... there was no criminal activity that was taking place. They were still within the permissible curfew time. In light of what our appellate courts have held, that there must be individualized, particularized suspicion, I can't find, based on the testimony, that there was any reasonable suspicion relating to [Defendant].

The Court of Appeals held that once the search of Filemon M. revealed he was carrying two guns, reasonable suspicion existed to search Defendant. *See Jason L.*, 1999–NMCA–095, ¶ 18, 127 N.M. 642, 985 P.2d 1222.

{9} Defendant has not argued on appeal that the New Mexico Constitution affords him greater protection than that afforded under the United States Constitution. *Cf. State v. Gomez*, 1997–NMSC–006, ¶¶ 22–23, 122 N.M. 777, 932 P.2d 1 (discussing requirements for preserving state constitutional claims for appellate review). We therefore review his claim, as did the Court of Appeals, only under the Fourth Amendment.

## II.

{10} The standard of review for suppression rulings is "whether the law was correctly applied to the facts, viewing them in a manner most favorable to the prevailing party." *State v. Werner*, 117 N.M. 315, 317, 871 P.2d 971, 973 (1994) (quoting *State v. Boeglin*, 100 N.M. 127, 132, 666 P.2d 1274, 1279 (Ct.App.1983)). The appellate court must defer to the district court with respect to findings of historical fact so long as they are supported by substantial evidence. *See State v. Attaway*, 117 N.M. 141, 144, 870 P.2d 103, 106 (1994). "Factfinding frequently involves selecting which inferences to draw." *State v. Lopez*, 109 N.M. 169, 171, 783 P.2d 479, 481 (Ct.App.1989). "[A]ll reasonable inferences in support of the [district] court's decision will be indulged in, and all inferences or evidence to the contrary will be disregarded." *Werner*, 117 N.M. at 317, 871 P.2d at 973 (quoting *Boeglin*, 100 N.M. at 132, 666 P.2d at 1279). The fact that another district court could have drawn different inferences on the same facts does not mean this district court's findings were not supported by substantial evidence. *See Lopez*, 109 N.M. at 171, 783 P.2d at 481. Conflicts in the evidence, even within the testimony of a witness, are to be resolved by the fact finder at trial. *See State v. Bloom*, 90 N.M. 192, 194, 561 P.2d 465, 467 (1977).

{11} In this case, we have no findings of fact from the district court. "This is a regular occurrence when we review decisions on motions to suppress evidence in criminal cases." *State v. Gonzales*, 1999–NMCA–027, ¶ 11, 126 N.M. 742, 975 P.2d 355, *cert. denied*, 126 N.M. 533, 972 P.2d 352 (1999). In circumstances such as this, "our practice has been to ... employ presumptions [and as] a general rule, we will indulge in all reasonable presumptions in support of the district court's ruling." *Id.* ¶ 15. One constraint upon that practice is that without an indication on the record that the district court rejected the uncontradicted evidence, we presume the court believed all uncontradicted evidence. *See id.* ¶ 16. When the evidence conflicts, we consider the evidence that supports the district court's ruling; and

we will draw all inferences and indulge all presumptions in favor of the district court's ruling.

{12} In this case there is conflicting evidence. For example, McDaniel testified that both boys kept looking back at the officers. Jordan indicated that Filemon M. kept looking back at the officers. McDaniel testified he asked the boys if they had any weapons; Jordan did not remember this exchange. McDaniel testified he could not see a weapon after Filemon M. unzipped his jacket so McDaniel conducted a pat-down. Jordan testified that Filemon M. reached for his waistband when asked to open his jacket. McDaniel grabbed his hand and again asked that Filemon M. open his jacket. At that point, the gun was visible. On some facts, the officers agreed. Sometimes one officer testified to something the other did not mention. We presume the district court believed the facts on which the officers agreed as well as the facts to which only one officer testified. We consider all that evidence; where the evidence conflicted, we consider only the evidence supporting the court's ruling. The relevant facts then are as follows.

{13} Defendant and Filemon M. were walking down the street together and Filemon M. was looking back at the police officers. Filemon M. was wearing a big, baggy coat and Defendant was wearing a coat on an evening that may have been cool. Filemon M. was fussing with his waistband. Neither boy seemed to cover as much ground as the officers had expected. Based on these observations, the police officers decided to approach the two boys. The two officers pulled their vehicle up to the boys and Officer McDaniel said, "Come here." Filemon M. appeared to be very nervous and was trying to position Defendant between the police officers and himself. McDaniel asked the boys what they were doing and the boys answered that they were "just walking." McDaniel then asked the boys if they were armed. The boys failed to respond immediately; McDaniel repeated the question. Eventually, the boys responded, "No." McDaniel then searched Filemon M. and found the first gun.

{14} Our task is to determine at what point during the encounter Defendant's right to be free from unreasonable search and seizure was implicated. "[A] seizure subject to Fourth Amendment scrutiny" does not occur every time a police officer approaches a citizen. *State v. Walters*, 1997-NMCA-013, ¶ 10, 123 N.M. 88, 934 P.2d 282. "Whether or not a search and seizure, including a stop and frisk of an individual by law enforcement officers, violates the Fourth Amendment is judged under the facts of each case by balancing the degree of intrusion into an individual's privacy against the interest of the government in promoting crime prevention and detection." *State v. Jones*, 114 N.M. 147, 150, 835 P.2d 863, 866 (Ct.App.1992). In developing that balance, courts have distinguished various types of encounters between police officers and the public on the basis of the degree of intrusion and required an appropriate level of suspicion to justify the particular intrusion. *See Lopez*, 109 N.M. at 171, 783 P.2d at 481. Arrests and investigatory stops are seizures invoking Fourth Amendment protections; community caretaking encounters are consensual, beyond the scope of the Fourth Amendment. *See Walters*, 1997-NMCA-013, ¶ 10, 123 N.M. 88, 934 P.2d 282. An arrest must be supported by probable cause and an investigatory stop must be supported by reasonable suspicion. *See id.* The police do not need any justification to approach a person and ask that individual questions; however, the officer may not "convey a message that compliance with their requests is required." *Florida v. Bostick*, 501 U.S. 429, 435, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

{15} In *Terry v. Ohio*, the United States Supreme Court held that a seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Lopez*, the New Mexico Court of Appeals stated that restraint on a person's freedom, within the meaning of *Terry*, can be the result of either physical force or a showing of authority. *See Lopez*, 109 N.M. at 170, 783 P.2d at 480. When determining whether a person is seized we consider "all of the circumstances surrounding the incident" in order to determine

whether "a reasonable person would have believed that he [or she] was not free to leave." *Id.* (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). Under *Lopez,* when determining whether a reasonable person would feel free to leave, courts should look at all of the factual circumstances, considering the following three factors: "(1) the conduct of the police, (2) the person of the individual citizen, and (3) the physical surroundings of the encounter." 109 N.M. at 171, 783 P.2d at 481.

{16} The State argues that Defendant was not seized until the officers initiated physical contact; or in other words, prior to the pat-down search the encounter was consensual. The district court's oral ruling, however, suggests the court believed Defendant had been seized earlier. The court's remarks refer only to the time of night and the absence of any reports of criminal activity; there is no mention of facts that became apparent during the encounter. Physical contact is not essential to a seizure. In *Lopez,* the Court of Appeals identified other circumstances in which a reasonable person might believe he or she could not end an encounter with the police.

Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

109 N.M. at 170, 783 P.2d at 480 (quoting *Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870). Giving proper deference to the district court, we conclude there was substantial evidence to support a finding that the officers made a show of authority and that a person in Defendant's position would not have felt free to leave after McDaniel twice asked the boys if they had any knives or weapons.

{17} The boys were approached at night on an empty street by two armed police officers whom they knew had been observing them prior to the encounter. *See United States v. Sanchez,* 89 F.3d 715, 718

(10th Cir.1996) (stating that the "threatening presence of several officers" and the "absence of other members of the public" are factors that could indicate that a reasonable person would not feel free to ignore an encounter with the police). The police officers did not ask to speak to the boys, but rather demanded that they approach. *See Smith v. United States,* 558 A.2d 312, 314 (D.C.Cir. 1989) (en banc) (holding police officer's show of authority, by announcing he was a police officer and ordering defendant to stop, was an investigative seizure implicating Fourth Amendment protections), *overruled in part on other grounds by Green v. United States,* 662 A.2d 1388, 1390 (D.C.Cir.1995). The tenor of the encounter changed when McDaniel asked Defendant if he was in possession of weapons. "Generally, courts throughout the country have ruled that a field inquiry becomes a *Terry* stop upon unsupported outright accusations of criminal activity." *In re J.G.,* 320 N.J.Super. 21, 726 A.2d 948, 953 (App.Div.1999) (internal quotation marks omitted). We believe the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory" is one factor that could lead a reasonable person to believe he or she is not free to terminate an encounter with the police. *Sanchez,* 89 F.3d at 718. Further, we also believe that questions asked in an "[a]ccusatory, persistent, and intrusive" manner can make "an otherwise voluntary encounter ... coercive." *United States v. Little,* 60 F.3d 708, 712 (10th Cir.1995) [hereinafter *Little II* ].

{18} At no point did the officers tell either boy they were free to leave or that they were not required to answer their questions. While case law has not required such advice, its absence is a relevant factor. *See Little II,* 60 F.3d at 713. It is also relevant that Defendant was fifteen years old at the time of the encounter. *See generally Lopez,* 109 N.M. at 171, 783 P.2d at 481. "Characteristics such as whether the person being questioned is a child or an adult ... are objective and relevant" to the question of whether a reasonable person would feel free to leave. *United States v. Little,* 18 F.3d

1499, 1505, n. 6 (10th Cir.1994) (en banc) [hereinafter *Little I* ].

{19} In *Lopez* the Court of Appeals determined that whether a person has been seized in violation of the Fourth Amendment is a mixed question of law and fact. 109 N.M. at 170, 783 P.2d at 480. The Court stated that "as a matter of law, a person is seized when the facts show accosting and restraint such that a reasonable person would believe he [or she] is not free to leave. However, we believe the question of whether the facts show such accosting and restraint is factual in nature." *Id.* We now conclude that because a seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away," *Terry*, 392 U.S. at 16, 88 S.Ct. 1868, *Lopez* essentially transformed the legal determination of a seizure into a factual finding. We take this opportunity to modify *Lopez* so that an appellate court can engage in a "meaningful review of [a] lower court['s] determinations." *State v. Attaway*, 117 N.M. 141, 145, 870 P.2d 103, 107 (1994). The determination of a seizure has two discrete parts: (1) what were the circumstances surrounding the stop, including whether the officers used a show of authority; and (2) did the circumstances reach such a level of accosting and restraint that a reasonable person would have believed he or she was not free to leave? The first part is a factual inquiry, which we review for substantial evidence. The second part is a legal inquiry, which we review de novo. We hold that on the evidence presented at the hearing, viewed in the light most favorable to the district court ruling, there was substantial evidence supporting a determination that the officers detained Defendant with a show of authority. We further conclude, as a matter of law, the show of authority in this case was such an accosting and restraint that a reasonable person would have believed he or she was not free to leave after McDaniel asked about weapons a second time.

{20} Having determined there was substantial evidence supporting the ruling that a seizure occurred prior to that search, we note that not all seizures are unconstitutional. We recognize an "officer may detain a person in order to investigate possible criminal activity." *State v. Cobbs*, 103 N.M. 623, 626, 711 P.2d 900, 903 (Ct.App. 1985). Investigatory detention is permissible when there is a reasonable and articulable suspicion "that the law is being or has been broken." *Id.* A reasonable suspicion is a particularized suspicion, based on all the circumstances that a particular individual, the one detained, is breaking, or has broken, the law. *See State v. Watley*, 109 N.M. 619, 624, 788 P.2d 375, 380 (Ct.App.1989). "Unsupported intuition and inarticulate hunches are not sufficient." *Cobbs*, 103 N.M. at 626, 711 P.2d at 903. Reasonable suspicion must exist at the inception of the seizure. *See Eli L.*, 1997–NMCA–109, ¶ 11, 124 N.M. 205, 947 P.2d 162. The officer cannot rely on facts which arise as a result of the encounter. *See United States v. Bloom*, 975 F.2d 1447, 1456 (10th Cir.1992) *overruled in part on other grounds by Little I*, 18 F.3d at 1504. Since Defendant was seized prior to the search of Filemon M., the fruits of that search are not relevant to the determination of whether there was reasonable and articulable suspicion to support the seizure of Defendant. In this case, the district court determined no reasonable suspicion existed to support a seizure of Defendant. We review this legal determination de novo. *See Eli L.*, 1997–NMCA–109, ¶ 6, 124 N.M. 205, 947 P.2d 162.

{21} *Eli L.* is dispositive. In *Eli L.* the Court of Appeals held that officers must possess "at the time the Child was stopped ... reasonable individualized suspicion that the Child had committed or was about to commit a crime." 1997–NMCA–109, ¶ 11, 124 N.M. 205, 947 P.2d 162. In closing argument, the district court specifically asked the State what facts supported a finding that reasonable suspicion existed to stop Defendant, assuming that a reasonable and articulable suspicion existed for the stop of his companion. In response, the State relied on Filemon M.'s conduct. As stated in *Eli L.*, New Mexico has "not dispense[d] with the requirement of individualized, particularized suspicion." *Id.* ¶ 12 (quoting *Jones*, 114 N.M. at 150, 835 P.2d at 866). Therefore, the district court was correct in refusing to rely on Filemon M.'s conduct to justify Defendant's detention.

{22} We also believe the district court correctly characterized Defendant's detention as a stop and appropriately required a showing of reasonable suspicion. Under the appropriate standard of review, the only suspicious conduct attributable to Defendant in the record was that he was wearing a coat of unknown weight on a summer evening and walking slowly in the company of someone who was fussing with his waistband and looking back at police officers. Individualized, particularized suspicion is a prerequisite to a finding of reasonable suspicion, and the district court did not err in concluding that the State had not established individualized, particularized suspicion that Defendant had committed or was about to commit a crime. On this record, the district court correctly concluded that the officers lacked reasonable suspicion to detain Defendant for investigation.

### III.

{23} On the evidence presented at the suppression hearing, viewed in the light most favorable to Defendant, the district court could find that the police officers detained Defendant with a show of authority and that a reasonable person in Defendant's position would not have felt free to leave. The court also did not err in concluding that the officers made an investigatory stop, which required reasonable suspicion, and that they had not proved their suspicion of Defendant was reasonable. Therefore, we conclude that the district court was correct in ruling that Defendant was seized by the officers within the meaning of the Fourth Amendment and in violation of his rights under that amendment. Accordingly, we reverse the Court of Appeals and we affirm the order of the district court suppressing the evidence in this case.

{24} **IT IS SO ORDERED.**

FRANCHINI, J., concurs.

SERNA, J., specially concurring.

BACA, J., and MAES, J., dissenting.

SERNA, Justice (specially concurring).

{25} I concur in the majority opinion. I write separately only to emphasize the limited scope of the majority opinion and to provide additional guidance to trial courts on this issue.

{26} As the majority and dissenting opinions in this case explain, trial courts must assess a number of factors in determining whether a show of authority transformed an otherwise consensual encounter into an investigatory stop. Based on the trial court's suppression of the evidence, we view the evidence relating to these factors in a light most favorable to the ruling. This case involves two armed, uniformed officers approaching two juveniles on an empty street at night after making visual contact with the juveniles and observing their movements for a period of time. Indulging all reasonable presumptions in favor of the district court's ruling, we must presume that the district court inferred from these historical facts, based on context, based on the characteristics of the individuals being approached, and based on witness demeanor, that this constituted a threatening officer presence. I do not believe that such an inference could be characterized as clearly erroneous or unsupported by substantial evidence. Additionally, the officers made a focused inquiry about illegal activity and did not accept the juveniles' failure to answer. We must again presume that the district court inferred that this line of questioning was accusatory and indicated to the juveniles that a response to the question was compulsory. Although there is no indication from the audiotape transcript of the suppression hearing that the officers used a coercive tone of voice, the trial court is in a better position to draw such inferences from the officers' demeanor and the background facts, including the locality in which the encounter occurred, the officers' pointed interest in Filemon M., the failure to advise Jason L. that he was not under arrest and was free to leave, and the use of commanding language to initiate the encounter. *See Michigan v. Chesternut*, 486 U.S. 567, 575 n. 7, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) ("[T]he subjective intent of the officers is relevant to an assessment of the Fourth

Amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted."). Thus, I believe that this finding is also supported by substantial evidence.

{27} Of course, another district court could draw different inferences from these facts, especially considering that defendants bear the initial burden of demonstrating that a consensual encounter has been transformed into an investigatory stop by a show of authority, *see State v. Baldonado*, 115 N.M. 106, 110, 847 P.2d 751, 755 (Ct.App.1992). Thus, by holding that the trial court's factual findings are supported by substantial evidence, the Court does not hold that the presence of two armed, uniformed officers constitutes a threatening presence as a matter of law. *Compare United States v. Bloom*, 975 F.2d 1447, 1454 (10th Cir.1992) ("Defendant was outnumbered, and he knew it."), *overruled in part by United States v. Little*, 18 F.3d 1499 (10th Cir.1994) (en banc) (*Little I*), *with United States v. Mixon*, No. 98–3004, 1999 WL 436269, at *3 (10th Cir. June 29, 1999) (unpublished opinion) ("The plainclothed officers approached Defendant and Mr. Rodriguez displaying their badges to identify themselves. The number of officers-two-matched the number of individuals being questioned-Defendant and Mr. Rodriguez. We cannot say that this constituted a threatening presence."), *cert. denied*, 528 U.S. 1066, 120 S.Ct. 624, 145 L.Ed.2d 517 (1999). Additionally, the Court does not create a per se rule that juveniles in general are more likely to feel coerced by police questioning. *See Little I*, 18 F.3d at 1505 n. 7 ("[W]hat we reject are rules which state or imply that *all* women, *all* minorities, or *all* young people are always more vulnerable to coercion."). Finally, the majority opinion does not and should not imply that this Court has created a per se rule that an officer's question about criminal conduct, even if repeated after a failure to answer, constitutes coercive conduct. *See United States v. Glass*, 128 F.3d 1398, 1407 (10th Cir.1997) (rejecting a per se rule that particularized focus, incriminating questions, and a request for consent to search constitutes a seizure under the Fourth Amendment); *see also United States v. Hernandez*, 93 F.3d 1493, 1499 (10th Cir.1996) ("Asking questions which may elicit incriminating answers is irrelevant to a determination of whether an encounter was consensual, although the manner in which the questions are asked is relevant; 'accusatory, persistent, and intrusive' questioning may turn an otherwise voluntary encounter into a coercive one if it conveys the message that compliance is required."). Instead, we merely presume from the district court's ruling that the court reasonably inferred from the specific factual context in this case that the questioning conveyed a message that a response was compelled at the time that the officer repeated the question concerning weapons.

{28} Once these historical facts, accompanied by reasonable inferences and presumptions, have been established, the question of whether these facts rise to the level of a seizure invoking the protections of the Fourth Amendment is reviewed de novo. Applying the historical facts, including the reasonable inferences of a threatening officer presence and coercive questioning, to the legal question of whether, under the totality of circumstances, a reasonable person would feel free to terminate the police encounter, I agree with the majority that the district court properly concluded that Jason L. was seized at the time the officers repeated the question about weapons.

{29} I would emphasize, however, the limited scope of this legal conclusion. This conclusion is not based on the sole fact of a repeated question concerning criminal activity. As courts have observed, the legal question of seizure should be determined on the basis of the totality of circumstances and will only rarely rest on any single factor. *See Bostick*, 501 U.S. at 439, 111 S.Ct. 2382 (rejecting a per se conclusion of a seizure based on the single factor of a confined location and stating, "We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."); *Glass*, 128 F.3d at 1406 ("[T]his court has steadfastly refused

to view any one of [the] factors as dispositive.").

{30} Additionally, the Court does not conclude that Defendant was seized prior to the time that Officer McDaniel repeated the question about weapon possession. In other words, even accepting the district court's determination of a threatening officer presence and, viewing the evidence in a light most favorable to the ruling, accepting that the officers ordered the juveniles to "come here," asked what they were doing, and asked for the first time whether the boys had weapons, these facts do not amount to a seizure as a matter of law, *Cf. Hernandez*, 93 F.3d at 1499 ("A limited number of routine questions about travel plans and relationship to passengers, followed by a question about possession of contraband and a request to search, are not sufficient to render an otherwise consensual encounter coercive."); *United States v. Angell*, 11 F.3d 806, 809–10 (8th Cir.1993) ("In the light of the totality of the circumstances, we conclude that [the officer's] actual language [of 'Stay there' or 'Hold it right there'], although perhaps somewhat more peremptory than precatory in tone, did not convert what would clearly have been a consensual encounter into a seizure within the meaning of the Fourth Amendment."); *Brown v. City of Oneonta*, 195 F.3d 111, 122 (2d Cir.1999) (similar); *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir.1996) (similar); *United States v. Polk*, 97 F.3d 1096, 1098 (8th Cir.1996) (holding that the display of a badge for the second time and informing the individual that the officer is on narcotics detail does not, "standing alone, constitute a Fourth Amendment seizure"). The totality of circumstances amounted to a seizure as a matter of law only when the officers, by repeating the question in the context of the encounter up until that time, conveyed the message to a reasonable person that a response was compulsory.

{31} I would stress that, even with the district court's inferences regarding the presence of the officers and the nature of the questioning, this case presents a very close question under the Fourth Amendment. *See generally Glass*, 128 F.3d at 1407 (discussing *Bloom*, in which the court held that a seizure occurred when two DEA agents, one of whom was uniformed and armed, confronted the defendant in a private train compartment, blocked the defendant's exit, asked if he was carrying drugs, and asked for consent to search luggage, and stating that "[e]ven with the presence of these factors ... *Bloom* was a close case"). In future cases, the absence of even one of the relevant circumstances present in this case might call for a different legal conclusion under federal law. *See id.* (discussing *United States v. Carhee*, 27 F.3d 1493 (10th Cir.1994)). "[C]haracterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870 (Opinion of Stewart, J.).

{32} I would finally like to point out that the majority opinion should not be interpreted as expressing any view as to whether the officers had reasonable suspicion to stop Filemon M. Indeed, I agree with the dissent that, under the facts of this case, reasonable suspicion did exist with respect to Filemon M. prior to the frisk even though there was no particularized reasonable suspicion with respect to Jason L. at that time. I also agree with the dissent that, if Jason L. had not been seized by the officers prior to the frisk of Filemon M., the discovery of two firearms on Filemon M., combined with the close proximity of Jason L. to the officers, would sufficiently justify a limited pat-down of Jason L. for weapons in order to ensure officer safety. However, because I conclude that Jason L. was seized prior to the frisk of Filemon M., and thus prior to a credible threat to officer safety, I must agree with the majority that the district court properly granted Defendant's motion to suppress.

BACA, Justice, dissenting.

{33} I must respectfully dissent from the majority's opinion. I would reverse the district court's suppression of evidence and hold that the officers' search of Jason L. did not violate his Fourth Amendment rights. I disagree with the majority's conclusion that a

seizure of Jason L. occurred during the initial encounter between the youths and officers. Even when considering the facts in a light most favorable to the prevailing party, I do not believe that the initial encounter created an atmosphere such that a reasonable person would have believed that he or she was not free to leave. I would find that the initial encounter was consensual in nature. It was only after Officer McDaniel reached for and made contact with Filemon M.'s hand just prior to the discovery of the weapons, that the encounter escalated into a *Terry* stop as to Filemon M. only. I believe that it was objectively reasonable for the officers, having discovered two weapons on Jason L's companion, to initiate a protective frisk of Jason L. limited only to the discovery of weapons.

{34} It is well-settled that police/citizen encounters fall within one of three categories: "(1) consensual encounters which do not implicate the Fourth Amendment[;] (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by reasonable suspicion of criminal activity [the *"Terry"* stop][;] and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." *United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir.1999) (citing *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir.1996)). Consensual encounters are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing. *See Florida v. Royer*, 460 U.S. 491, 497–98, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). An officer is free to approach people and ask questions without violating the Fourth Amendment rights of the individual questioned. *Id.*

{35} Although I agree with the majority's modifications of *State v. Lopez*, I cannot agree that substantial evidence exists to show that the officers used a show of authority during the initial encounter nor that circumstances established that the officers' display of authority rose to such a level that a reasonable person would have believed he or she was not free to leave. 109 N.M. 169, 171, 783 P.2d 479, 481 (Ct.App.1989) (stating "[a] reviewing court must determine whether the [district] court's result is supported by substantial evidence"); *see also United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (concluding "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"). In assessing whether a seizure has occurred, the *Lopez* Court identifies three factors to consider when reviewing the factual circumstances surrounding an encounter—factors I believe are consistent with the majority's modifications of *Lopez*: "(1) the conduct of the police, (2) the person of the individual citizen [1], and (3) the physical surroundings of the encounter." *Lopez*, 109 N.M. at 171, 783 P.2d at 481. Commonly cited examples of circumstances that might create a belief in a reasonable person that he or she was not free to terminate the encounter include; "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 170, 783 P.2d at 480.

{36} When the officers made their initial contact with the youths, the exchange appears to have been conducted in a conversational manner. After exiting their patrol car and approaching the youths, Officer Jordan testified that Officer McDaniel asked them, " 'Can we talk to you for a minute?' or 'Come here,' one of the two." He was not certain which. Officer McDaniel asked the youths

---

1. This factor requires courts to consider the characteristics of the defendant "in seeking to determine whether even a facially innocuous encounter might, in the circumstances, have overborne the citizen's freedom to walk away." *United States v. Black*, 675 F.2d 129, 134 (7th Cir.1982) (holding that defendant, as an articulate, intelligent young man, "was not so naive or vulnerable to coercion that special protection from police contacts was required by the Fourth Amendment"). In *United States v. Seventy–Three Thousand, Two Hundred Seventy–Seven Dollars*, 710 F.2d 283, 288 (7th Cir.1983), for example, the court interpreted this factor to include individual's "educational and psychological background, age, etc."

what they were doing, and received an answer that they were "just walking" which Officer McDaniel considered a "pretty good" response. There is no evidence that the officers commanded the youths in a tone of voice that could be considered as compelling action. The officers did not have their emergency lights engaged which might have signaled to the youths that they were not free to terminate the encounter. Nor is there evidence that either officer had his weapon drawn. Furthermore, I cannot agree with the interpretation of the facts that there were several armed officers creating a threatening presence. I do not believe two officers, in one patrol car, constitutes "several" officers in the manner likely contemplated by *Mendenhall* and *Lopez*. To adhere to such a conclusion might presumptively transform every standard two person officer patrol into an intimidating situation even during what might otherwise be considered a consensual encounter. Furthermore, evidence that it was late at night on an empty street, without more, is not sufficient to transform the encounter into a *Terry* stop. Finally, there is no evidence that Jason L.'s education, psychological background, or his age of fifteen, made him particularly vulnerable to intimidation by the officers. *See Seventy–Three Thousand, Two Hundred Seventy–Seven Dollars*, 710 F.2d at 288. Thus, even under the majority's modification of *Lopez*, I cannot agree that substantial evidence existed to support the conclusion that the officers' conduct demonstrated a show of authority. Nor can I agree that, as a matter of law, the circumstances of this case would communicate to a reasonable person that he or she was not free to decline the officer's requests or terminate the encounter. *See Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (reversing the Florida Supreme Court adoption of a per se rule that every encounter on a bus is a seizure and adhering to the rule that "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter").

{37} It is an established tenet of Fourth Amendment jurisprudence that investigatory detentions require that an officer have a reasonable suspicion that criminal activity is afoot before he [or she] may conduct a brief investigatory stop of a person. *See Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also State v. Eli L.*, 1997–NMCA–109, ¶ 12, 124 N.M. 205, 947 P.2d 162 (quoting *State v. Jones*, 114 N.M. 147, 150, 835 P.2d 863, 866 (Ct.App.1992), for the proposition that "we will not dispense with the requirement of individualized, particularized suspicion"). In *State v. Cobbs*, the majority correctly notes that "[u]nsupported intuition and inarticulate hunches are not sufficient." 103 N.M. 623, 626, 711 P.2d 900, 903 (Ct.App.1985); *see also Terry*, 392 U.S. at 27, 88 S.Ct. 1868 ("[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."). The reasonable suspicion standard is "a commonsensical proposition," and "[c]ourts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir.1993) (holding that an officer's observation of a man holding his hand out with a group of other men looking down at his open palm in an high drug trafficking area, late at night, constituted reasonable suspicion); *see also Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 674, 145 L.Ed.2d 570 (2000) ("[T]he reasonable suspicion determination must be based on commonsense judgments and inferences about human behavior."). The determination as to whether an investigatory detention is reasonable must be analyzed viewing the totality of the circumstances. *See Ohio v. Robinette*, 519 U.S. 33, 34, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (stating "In applying this test, the Court has consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry.").

{38} The officers had sufficient reasonable suspicion to justify an investigatory stop of Filemon M. While both youths were

walking and prior to the initial contact with the youths, the officers testified to several observations of Filemon M.'s conduct that raised their suspicion that criminal activity was afoot: Filemon M. glanced back at the officers several times, both youths appeared to alter the speed of their gait to avoid contact with the police after having been apprised of the officers' presence, and perhaps, most importantly, Filemon M. appeared to be fidgeting with or adjusting something in his waistband under a heavy jacket. Later, while speaking with the youths, during what I believe was a consensual encounter, Filemon M. continued to adjust something in his waistband, appeared very nervous, hesitated upon being questioned about possession of any weapons, and finally reached for something at his waistband. I believe these facts were sufficient to justify the search of Filemon M. under the reasonable suspicion standard that criminal activity was afoot. It is only at the point where Officer McDaniel initiated physical contact with Filemon M., when he reached for his waistband and the officer discovered the first weapon, which from the officers' testimony, appears to be a virtually simultaneous occurrence, that the consensual encounter transformed into a *Terry* stop—*as to Filemon M. only.* Only then could it be said that Officer McDaniel, "by means of physical force or show of authority" prevented Filemon M. from leaving. *Terry,* 392 U.S. at 19 n. 16, 88 S.Ct. 1868.

{39} The question now arises as to whether the search of Filemon M. then transformed the consensual encounter between Jason L. and the officers into a *Terry* stop requiring reasonable suspicion. I do not believe that it did. In *United States v. Davis,* 202 F.3d 1060, 1063 (8th Cir.2000), the Court disagreed with the argument that "the suspicion justifying a protective frisk must be present at the outset of an investigative stop." The Court reasoned that "[t]he danger to officer safety that justifies a protective search may arise after a consensual encounter or investigative stop has commenced." *Id.* In *Davis,* the defendant argued that after the officer's fruitless search of the defendant's companion, a consensual encounter was transformed into an investigative detention unsupported by reasonable suspicion that criminal activity was afoot; and that defendant's subsequent conduct—nervous behavior, movement behind his companion, and reaching into a jacket—could thus not form the basis for reasonable suspicion justifying the search of defendant's person. *Id.* at 1061. The Court disagreed and stated while protective searches normally occur during investigative detentions, "it need not follow from the fact that [because defendant's companion] was momentarily seized during the protective frisk that the frisk was also an investigative stop." *Id.* at 1062.

{40} It is true that no reasonable suspicion existed to support a *Terry* stop search of Jason L. prior to the discovery of weapons on Filemon M. However, even during the search of Filemon M., Jason L. was not subject to a seizure that would invoke Fourth Amendment protections. It is clear from the officers' testimony that only Filemon M.'s conduct had attracted their attention and that they noticed no suspicious conduct by Jason L., aside from previous observations that he was wearing a jacket during a July night, and had changed the pace of their walk after Filemon M. saw the officers. In addition, during the search, Jason L. was standing a short distance away from the activities occurring around Filemon M. and there is no evidence that during that time, he was commanded to move to a certain area or remain where he was. In contrast, Officer Jordan's testimony reveals that Jason L. "was standing right in front of the patrol car just like Officer McDaniel *asked* him to do." In short, the officers' actions could not have led Jason L. to reasonably believe that he was not free to terminate the encounter; the encounter was not transformed into an investigatory detention by the search of Filemon M.

{41} The *Davis* Court states that "[t]he only relevant question is whether [the officer] reasonably concluded, after pat-searching [the defendant's companion], that officer safety justified a pat-down search of [the defendant] because 'criminal activity may be afoot and [Davis] may be armed and presently dangerous.' " *Id.* at 1063 (citing *Terry,* 392 U.S. at 30, 88 S.Ct. 1868). As such, I

would find that in view of the totality of the circumstances, it was objectively reasonable for the officer to conduct a protective frisk of Jason L after discovering weapons on Filemon M. The protective pat-down of Jason L. was a momentary intrusion; however, had the search yielded no weapons, he would still have been free to leave and terminate the encounter with the officers. Although in *Davis,* the defendant's nervous conduct and suspicious behavior was sufficient to form the basis for the officer's reasonable conclusion that he was armed and dangerous, *id.* at 1063, in the present case, sufficient justification for a protective frisk, resulted after Officer McDaniel discovered two weapons in possession by Jason L.'s companion.

{42}   During the suppression hearing, the officers repeatedly testified that they conducted a pat-down search of Jason L. after discovering two weapons on Filemon M. for purposes of officer safety. The Court of Appeals cites to cases standing for the general proposition that officers may conduct a search for weapons on the associate of a person lawfully arrested, where that associate is a potential threat to officer safety. *In re Jason L.,* 1999–NMCA–095, ¶ 16, 127 N.M. 642, 985 P.2d 1222. In *Lewis v. United States,* the Court stated, "The fact that [appellant's] companion had just been arrested for unlawful possession of a firearm" and because both persons appeared to be more than just casual acquaintances, based on the officers observations of them walking together before approaching them "is a particularly compelling justification for the frisk of appellant." 399 A.2d 559, 561 (D.C.1979). I believe that the Court's commentary captures the essence of the question at issue in this case:

> In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 ... (1967), the Court affirmed the right of a limited search "to assure * * * that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him" despite the absence of probable cause for an arrest. We think that *Terry* recognizes and common sense dictates that the legality of such a limited intrusion into a citizen's personal privacy extends to a criminal's companions at the time of arrest. It is inconceivable that a peace officer effecting a lawful arrest ... must expose himself to a shot in the back from defendant's associate because he cannot on the spot, make the nice distinction between whether the other is a companion in crime or a social acquaintance.

*Id.; accord United States v. Poms,* 484 F.2d 919, 922 (4th Cir.1973) (accepting reasoning in *United States v. Berryhill,* 445 F.2d 1189, 1193 (9th Cir.1971), that "[a]ll companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory 'pat-down' reasonably necessary to give assurance that they are unarmed."); *People v. Garner,* 50 Ill.App.3d 294, 8 Ill.Dec. 357, 365 N.E.2d 595, 596 (1977) ("Although a police officer may not search a person simply because he is in the company of another person lawfully arrested ... he is not precluded from conducting a 'pat-down' of the companions of that person in order to protect himself or others, who may be nearby."). Thus, I agree with the Court of Appeals' reasoning that "even if the companion is not sufficiently suspected so that he could be legitimately seized for investigation, the circumstances may nonetheless indicate that the officer should take appropriate precautions." *Jason L.,* 1999–NMCA–095, ¶ 16, 127 N.M. 642, 985 P.2d 1222 (citing 4 Wayne R. LaFave, *Search and Seizure* § 9.5(a), at 263 (3d ed.1996) (internal quotes omitted).

{43}   During a highly dangerous situation created by the discovery of two weapons on an individual lawfully searched, officers must be able to secure the immediate vicinity without pause. I find it entirely reasonable that the officers conducted a search of Jason L. precisely for the stated reason of officer safety. After Officer McDaniel completed the first pat-down of Filemon M., found a weapon and secured it in the patrol car, Filemon M. then alerted the officers that they had failed to find his other concealed weapon stating, "I have another one on the other side." Officer Jordan then found the second weapon on Filemon M. The fact that the officers testified that up until the search of Filemon M., that Jason L. was not acting suspiciously and that they did not have rea-

son to suspect that Jason L. was armed and dangerous, does not prevent the officers from taking appropriate precautions to protect themselves and secure the area by conducting a limited pat-down on Jason L. for weapons.

{44}   The district court's conclusion that Jason L. was improperly seized is not supported by substantial evidence.   I would find that the initial encounter of the officers with the youths was consensual in nature.   As such, I would hold that the officer's protective frisk of Jason L. was objectively reasonable having just discovered two weapons on his companion and consequently that Jason L.'s Fourth Amendment right to be free from unreasonable searches and seizures was not violated.   Therefore, I would reverse the district court's order suppressing the weapons.