2006-NMCA-016

128 P.3d 487

**STATE of New Mexico, Plaintiff–Appellant,**

v.

**Clarence HARBISON, Defendant–Appellee.**

**No. 24,940.**

Court of Appeals of New Mexico.

Nov. 28, 2005.

Certiorari Granted, No. 29,597, Feb. 2, 2006.

Patricia A. Madrid, Attorney General, Santa Fe, M. Anne Kelly, Assistant Attorney General, Albuquerque, for Appellant.

John Bigelow, Chief Public Defender, Cordelia A. Friedman, Assistant Appellate Defender, Santa Fe, for Appellee.

## OPINION

WECHSLER, J.

{1} The State of New Mexico appeals the district court's grant of Defendant's motion to suppress evidence. The State argues that the district court erred in granting the motion with regard to a rock of crack cocaine Defendant allegedly threw underneath a car before being handcuffed because Defendant was not seized by the arresting officer until he was placed in handcuffs and therefore Defendant abandoned the crack cocaine. The State also argues that Defendant's seizure was supported by reasonable suspicion. Because we believe, based on the totality of the circumstances, that the arresting officer had reasonable suspicion to briefly detain Defendant, we reverse the district court's grant of Defendant's motion to suppress evidence.

## FACTUAL AND PROCEDURAL HISTORY

{2} On June 13, 2003, Albuquerque Police Department detectives from the Northeast Impact Team organized and executed an undercover "buy-bust" operation in northeast Albuquerque. The detectives chose the neighborhood in question because they had received "reports of the prevalence of drugs and drug dealing in the area." Six of the detectives involved in the operation, who were part of the "arrest team," were dressed in jeans, shirts, and black "tuck" vests that said "Albuquerque Police" with a badge on the front and the word "Police" on the back. The remaining team member, Detective J.R. Potter, who was undercover, wore plain clothes without any insignia identifying him as a detective. All of the detectives were driving unmarked police vehicles.

{3} The "buy-bust" operation consisted of Detective Potter posing as a drug purchaser by driving through the neighborhood and nodding at individuals on the corner. "[I]f he got a nod back, ... he would turn around" and attempt to buy drugs from the individual. At approximately 9:22 p.m., Detective Ray Soto, one of the "arrest team" members, observed Detective Potter interacting with an individual. After pulling his vehicle away from the individual, Detective Potter, using his radio, informed Detective Soto and the rest of his team members that he had just made a cocaine "buy" from that individual. Detective Potter described the suspect as a "black male[,] gray sweatshirt, black pants." He also informed the detectives that the suspect's sweatshirt was emblazoned with the phrase: "Real Men Don't Need Directions" and gave a height estimate of the suspect. The suspect was later identified as Lawrence Clark.

{4} Within thirty seconds of Detective Potter's cocaine purchase, the remaining members of the "arrest team" arrived and observed a group of "eight to ten subjects"

near a building approximately fifty feet away from where the buy had occurred. In addition to this group standing outside, there was a female sitting inside a Bronco SUV and three males inside another car, all within the immediate vicinity in question. As the detectives approached the group of people who were standing by the building, Detective Soto testified that he could see a subject fitting the suspect's description among the group.

{5} Defendant, who was in the group, was not standing immediately next to Clark. They were described as being "at ten and two [o'clock] in relation to each other around the circle." The officers did not observe any interaction between Defendant and Clark. As the detectives got out of their vehicles, the group began to scatter. Detective Soto had his gun drawn. Clark attempted to run and was captured and placed under arrest.

{6} Defendant also departed from the group, in the opposite direction from Clark, in what Detective Soto described as a "slow run." Detective Soto pursued Defendant, with his gun drawn, shouting "Police; don't move. Please don't move." After Detective Soto told Defendant to get on the ground, Defendant stopped running and "went to his knees" in front of a car and "threw something under the car." Detective Soto placed Defendant in handcuffs and looked under the car to see what Defendant had thrown. He found a broken glass crack pipe, a lighter, and a small piece of what was later identified as crack cocaine. Detective Soto testified that as he turned around to face Defendant, he noticed that Defendant, while handcuffed, "had his finger on his coin pocket" and was trying to remove something. Detective Soto then reached into Defendant's pocket and retrieved a second rock of crack cocaine. Defendant was formally arrested and charged with possession of crack cocaine and drug paraphernalia.

{7} Defendant filed a motion to suppress evidence, arguing that Detective Soto lacked reasonable suspicion when he pursued and seized Defendant. After hearing argument, the district court granted Defendant's motion and entered the order from which the State now appeals.

## STANDARD OF REVIEW

{8} The applicable standard of review of a ruling on a motion to suppress is "whether the law was correctly applied to the facts, viewing the facts in the light most favorable to the prevailing party." *State v. Joe,* 2003–NMCA–071, ¶ 6, 133 N.M. 741, 69 P.3d 251. We "must defer to the district court with respect to findings of historical fact so long as they are supported by substantial evidence." *State v. Jason L.,* 2000–NMSC–018, ¶ 10, 129 N.M. 119, 2 P.3d 856. We will indulge in all reasonable inferences in support of the district court's ruling and disregard all evidence and inferences to the contrary. *Id.* The issues of whether Defendant was seized and whether Defendant abandoned evidence prior to being seized by police detectives are legal issues that we review de novo. *See State v. Rector,* 2005–NMCA–014, ¶ 4, 136 N.M. 788, 105 P.3d 341 (reviewing de novo the issue of whether the defendant abandoned contraband prior to being seized by police officers); *State v. Walters,* 1997–NMCA–013, ¶ 8, 123 N.M. 88, 934 P.2d 282 ("Seizure under the Constitution is a question of law, but it is a question of fact whether a person was accosted and restrained in such a manner that a reasonable person in the same circumstances would believe he was not free to leave."). We review determinations of reasonable suspicion and probable cause de novo. *State v. Urioste,* 2002–NMSC–023, ¶ 6, 132 N.M. 592, 52 P.3d 964.

## ABANDONMENT ARGUMENTS

{9} The State appears to argue that the initial encounter between Detective Soto and Defendant was consensual and therefore Defendant abandoned the evidence he allegedly threw under the car. As a result, the State's position appears to be that no seizure took place until Defendant was handcuffed. We do not agree. Our case law recognizes three types of encounters between police officers and citizens in the context of crime investigation. They are "consensual encounters, investigatory detentions, and arrests." *State v. Ryon,* 2005–NMSC–005, ¶ 20, 137 N.M. 174, 108 P.3d 1032. "Consent is an exception to the Fourth Amendment

probable cause and reasonable suspicion requirements that police often rely on to investigate suspected criminal activity." *Id.* To determine whether a police-citizen encounter is consensual, we consider "the totality of the circumstances surrounding the encounter [to ascertain whether] the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Walters,* 1997–NMCA–013, ¶ 12, 123 N.M. 88, 934 P.2d 282 (internal quotation marks and citation omitted).

■ {10} In this case, the record indicates that Detective Soto had his weapon drawn and pursued Defendant while commanding him to stop and get down on the ground. A reasonable person would not have felt free to leave in that situation. *See Jason L.,* 2000–NMSC–018, ¶ 17, 129 N.M. 119, 2 P.3d 856 (stating that the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory" by armed police officers, in addition to threatening presence of several officers, could be considered as factors in determining that a reasonable person would not feel free to leave) (internal quotation marks and citations omitted). The initial contact between Officer Soto and Defendant cannot be characterized as a consensual encounter.

{11} The State also argues that Defendant abandoned the drug paraphernalia and a crack rock because he fled from Detective Soto and therefore he was not seized until Detective Soto placed him in handcuffs. The crux of the State's argument is that *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), and *Rector* stand for the proposition that once a person flees from an officer, the person is not seized for Fourth Amendment purposes until the person is physically apprehended. However, our reading of *Hodari D.* and *Rector* does not lead us to the State's conclusion that Defendant was not seized until Detective Soto placed him in handcuffs.

{12} The defendant in *Hodari D.* was standing on a street curb, in a high crime area, when he saw an unmarked police cruiser approaching. *Hodari D.,* 499 U.S. at 622–23, 111 S.Ct. 1547. The defendant apparently "panicked" at the sight of the police cruiser and fled. *Id.* at 623, 111 S.Ct. 1547. One of the officers in the cruiser chased the defendant, and as he ran, noticed that the defendant discarded what was later determined to be a rock of crack cocaine. *Id.* The California Court of Appeal held that the defendant was seized when he saw the officer chasing him and that the seizure was unreasonable under the Fourth Amendment. *Id.* The issue in *Hodari D.* was whether a person who flees in the face of a "show of authority" by police has been seized or arrested for Fourth Amendment purposes. *Id.* at 625–26, 111 S.Ct. 1547. The United States Supreme Court held that a person is not seized for Fourth Amendment purposes when the person does not yield to a show of authority by police. *Id.* at 626, 111 S.Ct. 1547. As a result, the defendant in *Hodari D.* was not seized until he was tackled by the police officer who was chasing him. *Id.* at 629, 111 S.Ct. 1547. Therefore, the rock cocaine that the defendant had discarded while being chased was deemed to have been abandoned even though the officer concededly did not have reasonable suspicion to pursue him. *Id.* at 624 n. 1, 629, 111 S.Ct. 1547.

{13} This Court dealt with a similar issue in *Rector,* in which the defendant also discarded a rock of crack cocaine while being chased by police officers. *Rector,* 2005–NMCA–014, ¶ 3, 136 N.M. 788, 105 P.3d 341. The defendant also argued that the evidence should have been suppressed by the district court because the police officers lacked reasonable suspicion for an investigatory stop and because the officer's discovery of the cocaine was the result of an illegal seizure. *Id.* ¶ 1. Relying on *Hodari D.,* this Court stated that "a seizure requires either physical force ... or, where that is absent, submission to the assertion of authority." *Rector,* 2005–NMCA–014, ¶ 6, 136 N.M. 788, 105 P.3d 341 (internal quotation marks and citation omitted). Therefore, we affirmed the district court's denial of the defendant's motion to suppress, stating that the defendant "neither submitted to the officers' show of authority nor was he physically restrained until he was grabbed and handcuffed by" the arresting officer. *Id.* ¶ 8.

**64**

{14} This case is not like *Hodari D.* and *Rector*. Defendant initially fled from Detective Soto at a "slow run" for less than one minute. As previously indicated, Detective Soto was pursuing Defendant with his gun drawn. In response to Detective Soto's command, Defendant stopped running and dropped to his knees. There is no question that Detective Soto was expressing a show of authority when he was chasing Defendant, while wearing his police vest, with his gun drawn, and commanding him "[p]lease don't move" and to get on the ground. *See United States v. Wood*, 981 F.2d 536, 539 (D.C.Cir. 1992) (stating that when presented with a question of whether a defendant was seized before being physically apprehended "we must determine (1) whether [the police officer] used a 'show of authority' to seize the appellant and (2) whether the appellant *submitted* to the assertion of authority"). It would appear from the record that Defendant was indeed obeying Detective Soto's command when he stopped running and began to kneel, and, at that time, he "submitted to the officers' show of authority" sufficiently to trigger a seizure for Fourth Amendment purposes despite not yet having been physically apprehended. *See Rector*, 2005–NMCA–014, ¶ 8, 136 N.M. 788, 105 P.3d 341.

{15} As we previously stated, we must defer to the district court's findings of historical fact. *Jason L.*, 2000–NMSC–018, ¶ 10, 129 N.M. 119, 2 P.3d 856. The district court found that "as [Defendant] went to his knees, he threw something under the car." Officer Soto testified that he did not know Defendant threw something until he heard "glass on the ground" after Defendant's knees hit the ground. Therefore, our deferential standard of review allows for the inference that Defendant knelt first and then discarded the contraband. *See id.* Because Defendant submitted to Detective Soto's authority when he stopped running and began to kneel, Defendant did not abandon the cocaine evidence prior to being seized as did the defendants in *Hodari D.* and *Rector*.

{16} This case is also not like *United States v. Lender*, 985 F.2d 151 (4th Cir.1993), upon which the State relies in making the argument that Defendant's conduct in stopping and kneeling was not a submission to Detective Soto's authority, but was instead, a "momentary halt." In *Lender*, two police officers patrolling an area known for high drug activity observed the defendant, who was in a group of four to five men, engaging in what appeared to be a drug transaction. *Id.* at 153. As the officers approached the group, it began to disperse. *Id.* When one of the officers asked the defendant to stop, he refused, instead telling one of the officers, "You don't want me; you don't want me." *Id.* As the defendant continued to walk away, "both officers observed him bring his hands to the front of his waist as though reaching for or fumbling with something in that area." *Id.* One of the officers again asked the defendant to stop, and as the defendant appeared to comply, "a loaded semi-automatic pistol fell from his waist to the ground." *Id.* Both the defendant and one of the officers simultaneously reached for the weapon. *Id.* The other officer immediately subdued the defendant, who was then arrested for carrying a concealed weapon. *Id.*

{17} In affirming the trial court's denial of the defendant's motion to suppress, the Fourth Circuit Court of Appeals stated that the defendant's "momentary halt on the sidewalk with his back to the officers" did not constitute "a yielding to their authority" for purposes of determining when he was seized. *Id.* at 155. Rather, the Court stated that the defendant's statements and fumbling prior to stopping, in addition to his conduct in immediately reaching for the pistol when it fell, were not consistent with conduct indicating he was yielding to the officers' authority. *Id.* The Court stated that the defendant's conduct was more "consistent with preparation to whirl and shoot the officers." *Id.*

{18} The record indicates that Defendant in this case did not exhibit conduct even remotely similar to that of the defendant in *Lender*. Defendant, in dropping to his knees, did nothing to indicate he was going to continue fleeing, much less attack Detective Soto. Instead, even though Defendant may have been attempting to deceive Detective Soto by discarding contraband, he was still seized because he complied with Detective Soto's command to cease running and

get down on the ground. *See In re A.T.H.*, 106 S.W.3d 338, 348–49 (Tex.Ct.App.2003) (holding that a juvenile was seized for Fourth Amendment purposes when he obeyed a police officer's order to place his hands above his head, even though he attempted to hide contraband, because the defendant "attempted to conceal a baggie while still complying with [the officer's] request").

## REASONABLE SUSPICION

{19} Our determination that Defendant did not abandon the evidence he discarded does not end our inquiry. The State argues that the district court erred in granting Defendant's motion to suppress because Detective Soto's encounter with Defendant was supported by reasonable suspicion. As an initial point, Defendant argues that the State has waived this issue by conceding the point in its proposed findings of fact and conclusions of law, proposing a conclusion of law stating, "The police officers did not have reasonable suspicion to stop or detain the defendant." The State argues both that the concession was a typographical error and that the issue was preserved because the prosecutor and Defendant argued the issue below and because the district court ruled on the issue. We agree with Defendant that the State's proposed findings purport to concede the issue. However, the issue of reasonable suspicion was litigated at length at the motion to suppress hearing, and our review of the transcript and the record indicate that the district court made a ruling on the issue. Therefore, despite the State's curiously drafted findings and conclusions, we believe the issue was preserved for review. *See State v. Vandenberg*, 2003–NMSC–030, ¶ 52, 134 N.M. 566, 81 P.3d 19 ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked.") (internal quotation marks and citation omitted).

{20} We therefore address the issue of whether Detective Soto had reasonable suspicion to pursue and detain Defendant. In "appropriate circumstances, a police officer may detain a person in order to investigate possible criminal activity, even if there is no probable cause to make an arrest." *State v. Eli L.*, 1997–NMCA–109, ¶ 8,

124 N.M. 205, 947 P.2d 162 (internal quotation marks and citation omitted). Such "circumstances must arise from the [police] officer's reasonable suspicion that the law is being or has been broken." *Id.* (internal quotation marks and citation omitted). "A reasonable suspicion is a particularized suspicion, based on all the circumstances that a particular individual, the one detained, is breaking, or has broken, the law." *Jason L.*, 2000–NMSC–018, ¶ 20, 129 N.M. 119, 2 P.3d 856. The officer may not rely upon "[u]nsupported intuition and inarticulate hunches." *Id.* (internal quotation marks and citation omitted).

{21} The State argues that Detective Soto developed reasonable suspicion to detain Defendant because (1) Detective Soto testified that he was familiar with multiple-person drug sales, (2) Defendant was standing in a group of eight to ten individuals near where one of those individuals had recently sold crack cocaine to an undercover detective, (3) Defendant initially fled from Detective Soto, and (4) Clark fled in the opposite direction of Defendant. We agree with Defendant that "New Mexico has not dispense[d] with the requirement of individualized, particularized suspicion." *Jason L.*, 2000–NMSC–018, ¶ 21, 129 N.M. 119, 2 P.3d 856 (alteration in original) (internal quotation marks and citation omitted). In addition, "[a] person's mere propinquity to others independently suspected of criminal activity does not, without more, authorize a [seizure of the person] unless the officer has reasonable suspicion [of criminal activity] directed specifically at that person." *State v. Morris*, 276 Kan. 11, 72 P.3d 570, 580 (2003). However, in this case, Detective Soto had individualized conduct on the part of Defendant to factor into his reasonable suspicion determination based on Defendant's flight.

{22} The consideration of a defendant's flight from police officers as a factor in determining reasonable suspicion is an issue of first impression in New Mexico. The United States Supreme Court dealt with a similar issue in *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), in a manner which we find instructive.

{23} In *Wardlow,* two police officers were driving through an area known for heavy narcotics trafficking when they noticed the defendant. *Id.* at 121, 120 S.Ct. 673. The officers were traveling as part of a four-car caravan because they anticipated finding a crowd "in the area, including lookouts and [narcotics] customers." *Id.* The officers noticed the defendant standing next to a building and holding an opaque bag. *Id.* at 121–22, 120 S.Ct. 673. The defendant looked in the officer's direction and fled. *Id.* at 122, 120 S.Ct. 673. The officers followed the defendant in their vehicle and observed him as he "ran through the gangway and an alley," and eventually caught up to and detained the defendant. *Id.* One of the officers "immediately conducted a protective patdown search for weapons because in his experience it was common for there to be weapons in the near vicinity of narcotics transactions." *Id.* The search yielded the discovery of a loaded .38–caliber pistol, which led to the defendant's arrest and subsequent conviction for unlawful use of a weapon by a felon. *Id.*

{24} The United States Supreme Court held that the officers had reasonable suspicion to briefly detain the defendant. *Id.* at 124–25, 120 S.Ct. 673. It reasoned that "it was not merely [the defendant's] presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police." *Id.* at 124, 120 S.Ct. 673. It further stated that:

> Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.

*Id.* at 124–25, 120 S.Ct. 673. The Court also instructed that an individual has the right, when approached by a police officer who does not have reasonable suspicion, "to ignore the police [officer] and go about his business." *Id.* at 125, 120 S.Ct. 673. However, it stated that flight is not akin to a mere refusal to cooperate. *Id.* Instead, it stated that flight, at the very least, creates an ambiguity regarding the lawfulness of the individual's conduct and that officers, when confronted with such flight, are allowed to briefly stop the individual and resolve the ambiguity. *Id.* at 125–26, 120 S.Ct. 673. Moreover, the Court stated that reasonable suspicion "requires a showing considerably less than preponderance of the evidence." *Id.* at 123, 120 S.Ct. 673.

{25} Other federal and state jurisdictions have held that a defendant's flight need not necessarily be "headlong" as articulated in *Wardlow,* in order to be a factor in determining the presence of reasonable suspicion under the totality of circumstances. *See, e.g., United States v. Hauk,* 412 F.3d 1179, 1184, 1192 (10th Cir.2005) (relying on *Wardlow* in stating that police officers' observation of an unidentified individual entering the defendant's house, coupled with the defendant's attempt to retreat into his house and immediately "close the door" after responding to the officers' knock were factors in providing reasonable suspicion and justification for the officers' protective sweep of the defendant's home without a warrant); *People v. Rushdoony,* 97 P.3d 338, 342–43 (Colo.Ct.App. 2004) (relying on *Wardlow* in interpreting the defendant's behavior as flight when the defendant "immediately" backed away from a dumpster in which he was digging and moved toward his car when he was approached by police, and determining that the defendant's flight, coupled with the fact that there had been recent burglaries in the area and the lateness of the hour, justified a brief investigatory stop by police); *State v. Griffin,* 31 Kan.App.2d 149, 61 P.3d 112, 115–17 (2003) (relying on *Wardlow* in stating that the defendant's attempt to drive away from approaching police officers, late at night, in an area where one officer had observed unrelated drug transactions, and where known convicted drug offenders resided, was sufficient under the totality of circumstances to give rise to reasonable suspicion justifying a brief detention of the defendant); *State v. Cushing,* 2004 UT App 73, ¶¶ 3, 20, 88 P.3d 368

(relying on *Wardlow* in stating that the defendant's flight from a police officer, which began as "almost [jogging]" from a vehicle stop of an apparently intoxicated driver when he was the passenger, in a high crime area, justified pursuit and a brief investigatory detention of the defendant) (alteration in original), *cert. granted*, 90 P.3d 1041 (Utah 2004).

{26}   In this case, the district court stated that Detective Soto and the APD Impact Team were conducting their "buy-bust" operation in an area known for "the prevalence of drugs and drug dealing." More significantly, Detective Soto approached a group of eight to ten people knowing that one of them had just committed a crime by selling drugs to an undercover police officer approximately one minute earlier. Defendant fled from Detective Soto in a "slow run" and initially disregarded Detective Soto's commands to stop running. Detective Soto articulated that he was familiar with multiple-person drug transactions and that he suspected Defendant of being a part of one, along with Clark and the other individuals in the immediate vicinity of Clark. He stated that he was familiar with situations where drug dealers were not working alone, but rather employed other individuals to "hold [drugs] for them" or act as lookouts. *See Griffin*, 61 P.3d at 116–17 (stating that a part of the totality of the circumstances analysis involves allowing "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person") (internal quotation marks and citation omitted). Detective Soto also stated that he pursued Defendant because he and his fellow officers were outnumbered, and he was concerned that Defendant might pose a threat to the safety of the officers if allowed to leave the officers' line of sight.

{27}   As stated in *Wardlow*, our totality of the circumstances analysis must not be guided by a requirement of "scientific certainty from . . . law enforcement officers where none exists." *Wardlow*, 528 U.S. at 125, 120 S.Ct. 673. Instead, we are to base our reasonable suspicion determination on "commonsense judgments and inferences about human behavior." *Id.* Indeed, the circumstances in this case indicate a stronger inference of Defendant's involvement in criminal activity than *Wardlow* because, in this case, known criminal activity had just taken place. In *Wardlow*, although the area was known for heavy drug trafficking, the officers had not just observed the commission of a crime. *See id.* at 121, 120 S.Ct. 673. It does not matter that Detective Soto did not actually see Defendant commit a crime or that the individual who actually sold narcotics to Detective Potter, Clark, was easily identifiable. The totality of the circumstances, indicating the existence of criminal activity and Defendant's flight from the group at the location of the criminal activity, gave rise to the reasonable inference that Defendant was also engaged in the criminal activity. Detective Soto was justified in pursuing Defendant and briefly detaining him for his own safety and to resolve the ambiguity created by Defendant's flight and subsequent refusal to heed directions. *See id.* at 125–26, 120 S.Ct. 673 (stating that flight, although by itself not necessarily indicative of wrongdoing may, when viewed in totality of the circumstances, give rise to reasonable suspicion allowing the officer to briefly detain the fleeing individual in order to "resolve the ambiguity"); *Hauk*, 412 F.3d at 1193 (stating that when viewed in the totality of the circumstances, facts giving rise to a concern for officer safety may justify a brief protective search of a defendant's home).

## CONCLUSION

{28}   When viewed under the totality of the circumstances, Detective Soto had reasonable suspicion to pursue and briefly detain Defendant based on Defendant's flight in conjunction with the known criminal activity that had just taken place at the location. Therefore, we reverse the district court's order granting Defendant's motion to suppress evidence.

{29}   **IT IS SO ORDERED.**

FRY and ROBINSON, JJ., concur.