The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number:_____

Filing Date: March 20, 2025

**No. A-1-CA-41037**

**STATE OF NEW MEXICO,**

　　　Plaintiff-Appellee,

v.

**EVERETT MULTINE,**

　　　Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**Daylene A. Marsh, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Walter Hart, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Melanie C. McNett, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**IVES, Judge.**

{1}     A jury found Defendant Everett Multine guilty of driving while under the influence of intoxicating liquor or drugs (DWI), contrary to NMSA 1978, Section 66-8-102(A) or (B) (2016). Defendant argues on appeal, as he did at trial, that the district court violated Article VII, Section 3 of the New Mexico Constitution by seating a juror without providing her with a Navajo language interpreter. *See State v. Singleton*, 2001-NMCA-054, ¶ 9, 130 N.M. 583, 28 P.3d 1124 (holding that defendants have standing to protect the rights of an excluded juror under Article VII, Section 3). The State argues that the district court's denial of an interpreter was based on an unstated factual finding that the juror's expressed need for an interpreter was not credible—a finding that the State argues is entitled to deference on appeal. We recognize that the determination about whether a juror needs an interpreter requires fact-finding by the trial court about whether a juror can meaningfully participate in the proceedings without an interpreter—findings that are owed deference on appeal under the ordinary substantial evidence standard of review. However, the record does not establish that any such findings were made by the district court in this case. When a question about the need for an interpreter arises, and a trial court requires a person to serve on a jury but refuses to provide an interpreter, the court must give a reasoned explanation on the record that is legally adequate to justify the refusal.

Because the district court did not provide a reasoned explanation to support a conclusion that the juror in this case could meaningfully participate without an interpreter, we hold that the district court erred, and Defendant's conviction therefore cannot stand.

{2} However, we are unpersuaded by Defendant's other arguments. We disagree with Defendant that the district court erred by denying his motion to suppress evidence, that the evidence presented at trial is insufficient to support his conviction, and that the district court erred by denying his motion to sanction the State by excluding its expert testimony.

{3} We therefore reverse Defendant's conviction and remand for a new trial.

**BACKGROUND**

{4} This case arises out of a traffic stop that took place in Farmington, New Mexico, after Deputy Anthony Sanchez "observed traffic violations" by Defendant. Specifically, he "observed [Defendant's] vehicle swerving within its lane and swerving out of its lane," as well as "going over the fog lines . . . that are on the side of each lane." He "then . . . observed [Defendant] go out of his lane a little bit . . . farther down, as well as almost strike the curb." The deputy activated his lights, and Defendant pulled over. When Deputy Sanchez approached the driver's side of Defendant's car, he "observed indicators of impairment, . . . includ[ing] the odor of an alcoholic beverage emitting from the vehicle, slurred speech from [Defendant],

as well as bloodshot, watery eyes." The deputy asked Defendant whether he had consumed alcohol, and Defendant replied that he had not. While Defendant was exiting the vehicle, Deputy Sanchez observed that he was "unsteady on his feet and he . . . walk[ed] with a staggering motion." After Defendant initially refused to perform field sobriety tests, Deputy Sanchez placed Defendant into custody. However, as the deputy was escorting Defendant to the squad car, Defendant "stated that he could pass the tests and he was not drunk." The deputy observed further indicators of impairment during the field sobriety tests and based on Defendant's driving, "his demeanor on scene, as well as the performance of . . . [the] standard field sobriety tests," he arrested Defendant.

{5} The deputy then conducted an inventory search of Defendant's car, during which he found two unopened alcoholic beverage "shooter containers." Deputy Sanchez read Defendant his rights and again asked whether he had been drinking, to which Defendant responded that he "had two of [the shooters] . . . hours ago." Defendant was transported to the San Juan County Adult Detention Center, where he refused to provide a breath sample. The deputy drafted a search warrant to obtain Defendant's blood for testing, a judge approved the search warrant, and Defendant's blood sample was taken. Defendant was ultimately charged with multiple crimes, including aggravated DWI for failure to submit to chemical testing, contrary to

Section 66-8-102(D)(3), and failure to maintain his traffic lane, contrary to NMSA 1978, Section 66-7-317 (1978).

{6}     Before trial, Defendant filed a motion to suppress evidence obtained from the traffic stop, arguing that he was seized without reasonable suspicion in violation of his rights under the Fourth Amendment of the United States Constitution and Article II, Section 10 of the New Mexico Constitution. The district court denied the motion after an evidentiary hearing, the relevant details of which are described below in our discussion of Defendant's claim of error regarding the motion to suppress.

{7}     Defendant's case originally went to trial on June 17, 2021, but a mistrial was declared when a juror fell asleep during the proceedings. The case went to trial again in October 2022. Before his second trial, Defendant filed a motion to exclude the State's expert witness, arguing that the State failed to timely file a witness list. After hearing argument the morning of trial, the district court denied the motion and proceeded to jury selection.

{8}     After voir dire and the selection of the jury panel, Juror 22 asked to speak with the judge and the parties. The judge and the juror had the following interaction:

Judge:      You have informed the bailiff that you wish to speak to us?

Juror 22:   Yes, I have a hard time sitting for a long time because of my back and I start getting all jittery. So, and then my second one is I can't really understand what people are talking about. And I have to really, really listen and

sometimes you have to tell me twice what they're talking about so I don't know . . . I don't know how to explain it.

Judge: If we were to give you the hearing devices would that—

Juror 22: I can hear good but it's just I can't concentrate. You know, I have a hard time concentrating what people are talking about. And I have to maybe explain to me maybe two or three times sometimes what they're talking about. I have kind of a hard time understanding.

Judge: . . . Is there anything we could do to help you to concentrate?

Juror 22: I don't know, that's why I'm bringing this up. I don't know. I don't really understand some of the words, like the hard words that's talk about. I can't understand all the English.

Judge: So possibly if we were to provide you with a—and I'm guessing here—would a Navajo interpreter—

Juror 22: Yes.

Judge: Would that help you?

Juror 22: Maybe in some places.

After talking to Juror 22, the judge heard argument from defense counsel and the State. Defense counsel argued that the juror should be allowed to sit on the jury with an interpreter, and the State argued that Juror 22 should be struck for cause, citing her inability to sit still for long periods and her need to hear things multiple times. The judge noted that the juror "did talk about the hard words," and the judge said, "Let's take a recess, let me go down and see if we can get her an interpreter and how long that would take."

{9}     The judge then questioned the jury clerk on the record. The jury clerk testified that Juror 22 had originally requested a Navajo interpreter on her juror questionnaire. The clerk then referenced a note from Juror 22's juror profile from September 2022, which read, Juror 22 "said she will not need an interpreter." The judge acknowledged this and commented that Juror 22 had gone "throughout the jury selection without informing us that she did not understand what was going on and needed an interpreter." The State then argued that the juror could sit on the jury without an interpreter based on the information supplied by the jury clerk regarding Juror 22's actual need for an interpreter. Defense counsel contended that the jury clerk's testimony was not clear evidence of Juror 22's need and that the court was required to provide an interpreter. The judge responded:

> Well we're not going to be able to get an interpreter today. She did state that she basically didn't want to serve on the jury because she has the medical issues that . . . causes her to get jittery, . . . that she can't sit for long periods of time, she doesn't understand all the concepts, so I think basically she was requesting to be removed.

The parties renewed their arguments, after which the court concluded that it would not provide an interpreter, nor would it "discharge her from jury duty." The case proceeded to trial, and Defendant was convicted.

## DISCUSSION

**I.      No Legally Adequate Justification Was Given for Denying the Juror's Request for an Interpreter**

{10}      Defendant argues that by seating Juror 22 without providing an interpreter for her, the district court violated Article VII, Section 3 of the New Mexico Constitution, which provides, in pertinent part, that "[t]he right of any citizen of the state to . . . sit upon juries, shall never be restricted, abridged or impaired on account of . . . language . . . or inability to speak, read or write the English or Spanish languages except as may be otherwise provided in this constitution." The State contends that Juror 22 waived her right to an interpreter and that, in any event, her right was not violated. We address waiver and the merits in turn.

{11}      The State argues that Juror 22 waived the right to appeal the district court's decision to seat the juror without an interpreter because Juror 22 did not "timely, adequately, and definitively . . . assert that right." This argument is contrary to New Mexico law, which does not impose *any burden at all* on jurors to assert their rights under Article VII, Section 3—much less impose a burden of doing so at a particular time and in a particular manner—and which instead allows the defendant, the state, or the court itself to raise the potential need for an interpreter. Precedent establishes that "both the state and the defendant in a criminal action can protect the rights of prospective jurors to be free from discriminatory exclusion," *Singleton*, 2001-NMCA-054, ¶ 9, and our Supreme Court's rule on the subject states that "[t]he need

for a court interpreter may be identified by the court or by a case participant," Rule 5-122(B)(1) NMRA. Because prospective jurors may be "unable or unwilling to express" their need for an interpreter, *State v. Rico*, 2002-NMSC-022, ¶ 10, 132 N.M. 570, 52 P.3d 942, New Mexico law imposes no requirement that a juror assert their need for an interpreter. Instead, the need may be identified by the court or a case participant. *See* Rule 5-122(B)(1); *see also* Rule 5-122(A)(1) (defining "case participant" as "a party, witness, or other person required or permitted to participate in a proceeding governed by the[] [R]ules" of Criminal Procedure). In this case, the possible need for a Navajo interpreter was identified shortly after the jury was empaneled, and defense counsel repeatedly argued before the district court that Juror 22 had the constitutional right to an interpreter. That sufficed; no waiver of the constitutional right occurred.

{12}    Turning to the parties' arguments on the merits, in light of the constitutional protection involved, we review the alleged violation of Article VII, Section 3 de novo. *See State v. Samora*, 2013-NMSC-038, ¶ 6, 307 P.3d 328. In the context of the constitutional right to an interpreter, the district court must provide an explicit statement that is legally sufficient to justify its ruling; that is, "a *reasoned explanation* on the record." *Rico*, 2002-NMSC-022, ¶ 11 (emphasis added). As we will explain, because we conclude that no reasoned explanation was given in this

case, we hold that the district court erred by requiring Juror 22 to participate in Defendant's trial without an interpreter.

{13}   The foundation for our holding is the two-part test that New Mexico courts use to determine whether a juror's rights have been violated under Article VII, Section 3. Under the first part of the test, when a trial court becomes "aware that a member of a given venire has difficulty with either English or Spanish or both," the trial court must "determine whether the difficulty will prevent the juror from following the proceedings." *Rico*, 2002-NMSC-022, ¶ 16; *see also id.* ¶ 1 (recognizing that a juror needs an interpreter if they are "not otherwise able to participate in court proceedings" due to language barriers); Rule 5-122(B)(1) ("The need for a court interpreter exists whenever a case participant is unable to hear, speak, or otherwise communicate in the English language to the extent reasonably necessary to fully participate in the proceeding."). To make this factual determination, the trial court must make an inquiry sufficient to allow the court to assess the extent of the juror's language difficulty and to determine if the juror is able to participate fully in court proceedings without the assistance of an interpreter. If there is no need for an interpreter, the inquiry ends without reaching the second part of the test.

{14}   However, if the trial court finds that a juror needs an interpreter, the second part of the test requires the court to determine whether an interpreter can be secured

through "reasonable efforts" by the court, and if the answer is yes, an interpreter must be provided. *See Rico*, 2002-NMSC-022, ¶¶ 11-12, 16. What amounts to reasonable efforts "depend[s] on the circumstances in which the problem arises," and on appeal, courts consider "the steps actually taken to protect the juror's rights, the rarity of the juror's native language and the difficulty that rarity has created in finding an interpreter, [and] the stage of the jury selection process at which it was discovered that an interpreter will be required." *Id.* ¶ 12. If an interpreter is not available through reasonable efforts, and the record establishes that providing an interpreter would instead place a "substantial burden" on the court, the constitution does not require that an interpreter be provided to accommodate the juror; only at this point is the court allowed to excuse the juror due to the juror's language difficulties. *See id.* ("[A] trial court shall not excuse a juror . . . absent a showing that accommodating that juror will create a substantial burden.").

{15}     Relatedly—and significantly in this case—even if providing an interpreter would be substantially burdensome and even if reasonable efforts were made, a person who needs an interpreter in order "to fully participate in the proceeding," Rule 5-122(B)(1), must never be seated on a jury without an interpreter. When a potential juror cannot adequately understand what is being said by witnesses, lawyers, the judge, and other jurors, that person obviously cannot "fulfill their civic dut[y]," *Rico*, 2002-NMSC-022, ¶ 7, and when a member of the jury cannot

understand the proceeding, the parties and the public are deprived of the fair trial and reliable verdict to which they are entitled. Therefore, the result in this case—seating Juror 22 without an interpreter—cannot be justified based on any determination that reasonable efforts were made or that providing an interpreter would have been substantially burdensome. Because the second part of the test, standing alone, cannot support the district court's decision as a matter of law, we must focus on the first part of the test: the need for an interpreter.

{16}    Specifically, the question before us is whether the district court provided a reasoned explanation that is legally sufficient to establish that Juror 22 did not need an interpreter. We consider this question in light of our Supreme Court's recognition that an explanation on the record is required to fully protect the rights guaranteed by Article VII, Section 3. In *Rico*, our Supreme Court stated that when a trial court excuses a juror who needs an interpreter, the trial court must provide a "reasoned explanation on the record" that justifies the excusal. *Id.* ¶ 11. Although *Rico* does not include an explicit statement of the rationale behind this requirement, we think the purposes of requiring trial courts to explain their reasoning in this context are the same as in other contexts: to create a record that permits meaningful appellate review, and to inform the affected parties of the basis for the ruling. *Cf. State v. Lewis*, 2018-NMCA-019, ¶ 16, 413 P.3d 484 ("[W]ithout an adequate record explaining the district court's ruling and reasoning [regarding the imposition of

discovery sanctions], we cannot properly perform our role as an appellate court.");
*State v. Loretto*, 2006-NMCA-142, ¶ 12, 140 N.M. 705, 147 P.3d 1138 ("[I]t is important that the [trial] court make specific findings [related to whether a crime is a serious violent offense for sentencing purposes] both to inform the defendant being sentenced of the factual basis . . . and to permit meaningful and effective appellate review."). These purposes can only be achieved if the reasoned explanation requirement also applies when, as in this case, a trial court decides to require a person to serve on a jury without an interpreter. We therefore conclude that when the need for an interpreter has been raised, the trial court may only seat that juror without an interpreter after the court conducts an adequate inquiry into the juror's ability to understand and then provides a reasoned explanation on the record that is legally sufficient to justify its decision—an explanation that supports the determination that the juror can fully participate in the proceedings without the assistance of an interpreter.

{17}     In this case, the district court did not provide such a reason for seating Juror 22 without an interpreter. Although the district court made some remarks during and after counsel's arguments on the issue, we are not sure how to interpret those remarks. It is not clear to us which remarks were intended to be definitive statements of the reasons for the district court's ultimate decision, as opposed to comments on the evidence and arguments as they were being presented. For reasons we will

explain, even if we assume that all of the remarks were made to explain the district court's reasoning, that reasoning does not justify seating Juror 22 without an interpreter; the remarks do not support the conclusion that Juror 22 understood the English language well enough to meaningfully participate in the proceedings.

{18} Here, the court began to address the juror's need for an interpreter by speaking to Juror 22 on the record. The juror expressed that she had difficulty with "hard words" and could not understand "all the English." The court asked whether a Navajo interpreter would help, and the juror replied, "Yes, . . . maybe in some places." The jury clerk then testified that Juror 22 had requested an interpreter on her juror questionnaire but had subsequently told an individual in the clerk's office in a phone conversation that she would not need an interpreter. It is unclear from the record what exactly the juror was suggesting in that phone conversation: whether she was saying that she did not need an interpreter for the phone conversation itself or whether she was anticipating that she would not need an interpreter at trial. The court eventually stated that it was not going to be able to get an interpreter that day and that it believed "basically [Juror 22] was requesting to be removed." After hearing argument from the parties, the court decided not to provide the juror with an interpreter and kept the juror on the panel.

{19} The State argues that the district court's remark that "basically [Juror 22] was requesting to be removed" amounted to an implicit credibility determination about

the juror's motivations to get out of jury duty. As we understand the State's argument, it suggests that the district court believed the juror was not being honest about the extent of her difficulties with English because she wanted to avoid jury duty, and that this credibility determination is what supported the judge's decision to keep Juror 22 on the jury without an interpreter. Even if it were true that Juror 22 did not wish to be selected to serve as a juror, the desire to avoid jury duty and the need for an interpreter are not mutually exclusive. In other words, a juror who needs an interpreter might also want to get out of jury duty. A juror's desire to avoid jury duty does not relieve the trial court of its responsibility to determine whether the juror can understand and participate in the proceedings without an interpreter. The relevant inquiry is not whether the juror wishes to be excused but instead whether the juror needs an interpreter. A statement that the juror wants to get out of jury service does not answer the relevant question about the juror's ability to understand the proceedings.

{20} Because the denial of an interpreter is not justified by a reasoned explanation on the record, we agree with Defendant that Article VII, Section 3 was violated when Juror 22 was kept on the jury without an interpreter. This means that Defendant's conviction must be reversed. *See Samora*, 2013-NMSC-038, ¶ 15 ("When Article VII, Section 3 is violated and the objection properly preserved, an appellate court is required to reverse what would have been an otherwise valid conviction.").

## II.    Motion to Suppress

**{21}**    Defendant argues that the district court erred in denying Defendant's motion to suppress for lack of reasonable suspicion because the stop was not justified at its inception. Defendant contends that there were not specific, articulable facts that Defendant was driving while intoxicated or committing a traffic violation, and that the district court's findings related to the deputy's reasonable suspicion are not supported by substantial evidence. We disagree.

**{22}**    Because "motion[s] to suppress present[] a mixed question of law and fact," *State v. Paananen*, 2015-NMSC-031, ¶ 10, 357 P.3d 958 (internal quotation marks and citation omitted), we review "factual matters with deference to the district court's findings if substantial evidence exists to support them, and [we] review[] the district court's application of the law de novo." *State v. Almanzar*, 2014-NMSC-001, ¶ 9, 316 P.3d 183. When the record includes limited facts, we make "all reasonable presumptions in support of the district court's ruling." *State v. Jason L.*, 2000-NMSC-018, ¶ 11, 129 N.M. 119, 2 P.3d 856 (text only) (citation omitted).

**{23}**    In order for a traffic stop to be reasonable under the Fourth Amendment of the United States Constitution and Article II, Section 10 of the New Mexico Constitution, a police officer must have "reasonable suspicion that the law is being or has been broken." *State v. Martinez*, 2018-NMSC-007, ¶ 10, 410 P.3d 186 (text

only) (citation omitted). "This includes reasonable suspicion that a traffic law has been violated." *State v. Siqueiros-Valenzuela*, 2017-NMCA-074, ¶ 11, 404 P.3d 782.

{24} Here, the district court found in its written order that Deputy Sanchez "had reasonable suspicion to stop Defendant" because he "saw Defendant's vehicle swerving within the lane, swerving over the fog line and ma[king] contact with the center medi[an]." The court concluded that "[t]hese two specific articulable facts . . . establish[ed] reasonable suspicion for the [d]eputy to stop . . . Defendant." Defendant contends that neither finding was supported by substantial evidence. We agree with Defendant that there is no evidence to support the district court's finding that Defendant made contact with the median, but we conclude that there is substantial evidence to support the finding that Defendant swerved within the lane and over the fog line.

{25} There was no video evidence or testimony presented at the suppression hearing to support the district court's finding that Defendant made contact with the median. Deputy testified that Defendant's vehicle "*almost* [came] into contact with . . . the median," (emphasis added) and the dashcam video does not show Defendant's car coming into contact with the median. Even drawing reasonable presumptions in favor of the district court's ruling, *see Jason L.*, 2000-NMSC-018, ¶ 11, we conclude that this finding is not supported by substantial evidence.

{26} Based on that conclusion, we are left with two questions: whether the district court's finding that Defendant swerved within his lane and over the fog line is supported by substantial evidence, and if so, whether that finding supports reasonable suspicion of a traffic violation. Our answer to both questions is yes.

{27} On the substantial evidence question, Defendant argues that Deputy Sanchez's dashcam video does not show Defendant crossing over the left fog line and that evidence of his tire merely grazing the fog line "does not give rise to reasonable suspicion of a traffic violation." It is true that the video recording does not clearly show Defendant cross over the fog line. However, Deputy Sanchez testified that while he was on patrol, he saw Defendant's "car swerving in and out of [its] lane." The deputy testified that he "saw [Defendant] swerve over the fog line, which is the line that connects to the median, as well as the center stripe line, which would connect him to the other lane of travel, the slow lane." As the car was approaching a construction zone, Deputy Sanchez saw the car "almost come into contact with the curb, . . . as well as go over a lane again." At least some of these violations happened *before* the dashcam was turned on, according to the deputy. Employing all reasonable presumptions in favor of the district court's ruling, *see id.*, we presume that the district court made a credibility determination about the deputy's testimony, and believed that Deputy Sanchez had witnessed traffic violations prior to turning on the dashcam. *See State v. Yazzie*, 2019-NMSC-008,

¶ 14, 437 P.3d 182 ("[A]n appellate court must presume that the district court credited an officer's testimony, even if that testimony is not perfectly aligned with video evidence."). We will not second-guess this credibility determination. *See State v. Salas*, 1999-NMCA-099, ¶ 13, 127 N.M. 686, 986 P.2d 482 ("We defer to the district court when it weighs the credibility of witnesses.").

{28} Having determined that the district court's finding related to Defendant's swerving is supported by substantial evidence, we review the district court's application of the law to those facts de novo. *See Almanzar*, 2014-NMSC-001, ¶ 9. Defendant was charged with failure to maintain his traffic lane, pursuant to Section 66-7-317, for "fail[ing] to drive as nearly as practicable entirely within a single lane." When determining whether an individual maintained their lane as nearly as practicable and therefore whether an officer's stop for this traffic violation was justified at its inception, this Court held in *Siqueiros-Valenzuela* that it is necessary for courts to consider the "totality of the circumstances," including "whether there were any weather conditions, road features, or other circumstances that could have affected or interfered with a driver's ability to keep [their] vehicle in a single lane." 2017-NMCA-074, ¶ 19. This Court reasoned that the "[d]efendant's isolated, momentary touching [of] the left shoulder line" as she passed a semi-truck going seventy-five miles per hour on the highway "did not give rise to a reasonable suspicion" of a traffic violation. *Id.* ¶¶ 22, 26. Therefore, the "[d]efendant's slight

touching of the lane line was feasibly and safely executed under the totality of the circumstances." *Id.* ¶ 22. Defendant attempts to draw parallels between *Siqueiros-Valenzuela* and the instant case, arguing that Defendant "maintained his lane as safely as practicable," considering that he was "enter[ing] a construction zone with an altered traffic pattern," "[i]t was dark outside," he was not speeding, and his tires only "grazed the white fog line." We are not persuaded.

{29}   Here, unlike the defendant in *Siqueiros-Valenzuela*, Defendant was not traveling at a high rate of speed on the highway or attempting to pass a semi-truck. Instead, there is evidence that *before* Defendant entered the construction zone, he swerved out of his lane multiple times. Additionally, the evidence did not establish one brief touch of the shoulder lane—as was the case in *Siqueiros-Valenzuela*—but rather multiple instances of swerving within and outside the lane. Finally, although it was dark outside, Defendant does not argue that darkness alone justified the lane departures here, and we are aware of no basis for reaching that conclusion.

{30}   We conclude that the totality of circumstances gave the deputy reasonable suspicion to believe that Defendant failed to maintain his lane as nearly as practicable. *See id.* ¶ 19. We therefore hold that the district court did not err by denying Defendant's motion to suppress.

## III.   Sufficiency of the Evidence

{31}   Defendant argues that the evidence is not sufficient to support his conviction, and we address this argument because if Defendant is correct, double jeopardy principles would bar the State from trying Defendant again on remand. *See State v. Mascareñas*, 2000-NMSC-017, ¶ 31, 129 N.M. 230, 4 P.3d 1221. Defendant argues that "[t]he State failed to prove that [he] was impaired to the slightest degree" because his blood alcohol content was under the per se limit for driving while intoxicated, "he was driving as safely as practicable," and his performance on field sobriety tests can be explained by his bad back. These arguments do not require reversal. "[V]iew[ing] the evidence in the light most favorable to the guilty verdict, [and] indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict," *State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 (internal quotation marks and citation omitted), we conclude that the evidence suffices.

{32}   We measure the sufficiency of the evidence against the jury instructions provided at trial. *State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883. Here, the jury instructions addressed the State's two alternative theories of DWI; the jury was instructed, in relevant part, that the State must prove that

1.   [D]efendant operated a motor vehicle;

2.   At the time:

   a.   [D]efendant was under the influence of intoxicating liquor, that is, as a result of drinking liquor . . . [D]efendant was

> *less able to the slightest degree*, either mentally or physically, or both, to exercise the clear judgment and steady hand necessary to handle a vehicle with safety to the person and the public; *or*
>
> b.    [D]efendant was under the influence of drugs to such a degree that . . . [D]efendant was incapable of safely driving a vehicle.

(Emphasis added.) Because we conclude that the first theory is supported by sufficient evidence, we do not consider the second. When determining whether an individual is impaired to the slightest degree, the jury may "rely on common knowledge and experience to determine whether [the d]efendant was under the influence of alcohol[,]" including indicators such as their "driving behavior, physical condition, admission of drinking, and performance on the field sobriety tests." *State v. Neal*, 2008-NMCA-008, ¶ 27, 143 N.M. 341, 176 P.3d 330.

{33}    That standard is met by the State's evidence in this case. At trial, the deputy testified about Defendant's driving leading up to his arrest. Deputy Sanchez stated that he "observed [Defendant's] vehicle swerving within its lane and swerving out of its lane, going over the fog lines," and the deputy testified that he saw Defendant "almost strike the curb." After pulling Defendant over and approaching the driver's side window, Deputy Sanchez testified that he smelled the "odor of an alcoholic beverage emitting from the vehicle," and observed "slurred speech from [Defendant], as well as bloodshot watery eyes." Then, "when [Defendant] exited the

vehicle, [Deputy Sanchez] notice[d] that [Defendant] was unsteady on his feet and he . . . walk[ed] with a staggering motion."

{34} Deputy Sanchez also testified about his observations while Defendant performed field sobriety tests. When the deputy was administering the horizontal gaze nystagmus test, the deputy continued to smell the odor of an alcoholic beverage, and the deputy observed "a very noticeable body sway." Then, during the walk-and-turn test, Defendant "struggled to get into the position." Deputy Sanchez testified that

> in the instructional stage, [Defendant got] out of the position . . . he started off unbalanced, he . . . step[ped] off line, [and] he missed heel-to-toe steps. When he got close to the turn portion of the test, he took an additional step, he turned incorrectly by not leaving his front foot planted. . . . When he got turned around, [Defendant also] used his arms to balance . . . and then on the way back, he . . . missed heel-to-toe steps and he stepped off line.

And during the one-leg stand test, Defendant "sway[ed]," "put his foot down," and "hopped to try to regain his balance." Based on these indicators of impairment, Deputy Sanchez arrested Defendant. The deputy then did an inventory search of Defendant's car and found two alcoholic beverage shooters. Although Defendant had previously denied drinking any alcohol, after the shooters were found, Defendant admitted to the deputy that he had "two of [the shooters] . . . hours ago." Defendant's own admission that he drank alcohol was further evidence available to the fact-finder to support a DWI conviction. *See Neal*, 2008-NMCA-008, ¶ 27.

{35} Finally, Melinda Boyd, a forensic toxicologist, testified regarding the results of Defendant's blood alcohol content test. She testified that Defendant had alcohol in his blood and that the amount of alcohol in his blood could impair his ability to drive.

{36} Viewing all of this testimony together under our deferential standard of review, we hold that the evidence suffices to support Defendant's DWI conviction. *See State v. Gutierrez*, 1996-NMCA-001, ¶ 4, 121 N.M. 191, 909 P.2d 751 (upholding a DWI conviction when the defendant smelled of alcohol, had bloodshot and watery eyes, failed field sobriety tests, admitted to drinking alcohol, the defendant's vehicle was weaving into other traffic lanes, defendant nearly hit another vehicle on the road, and the officers believed the defendant was intoxicated). We therefore hold that double jeopardy does not bar retrial.

{37} Defendant's attacks on the evidence are not persuasive to us. First, Defendant argues that his blood sample was under the per se limit for driving while intoxicated, pursuant to Section 66-8-102(C)(1). However, the State's theory at trial was not that Defendant's blood alcohol level was above the per se DWI limit. Instead, the State's theory, as reflected in the jury instructions, was that Defendant was impaired to the slightest degree. Second, Defendant contends that "he was driving as safely as practicable[] given the circumstances" and that his poor performance on the field sobriety tests is attributable to his bad back. We will not reverse on this basis because

the jury was not required to accept these defenses. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts.").

## IV.     Motion to Exclude Expert Witness Testimony

{38}     Defendant argues "that the district court abused its discretion by allowing the lab analyst to testify at trial, despite the State's delayed disclosure." We disagree.

{39}     We review a district court's decision regarding whether to exclude a witness for an abuse of discretion, "view[ing] the evidence—and all inferences to be drawn from the evidence—in the light most favorable to the district court's decision." *State v. Le Mier*, 2017-NMSC-017, ¶ 22, 394 P.3d 959. Importantly, "[t]rial courts possess broad discretionary authority to decide what sanction to impose," *id.*, and as an appellate court, "we cannot second-guess our [trial] courts' determinations as to how their discretionary authority is best exercised," *id.* ¶ 17. When, as in this case, a trial court is determining whether the exclusion of a witness is an appropriate remedy for a discovery violation, the court must consider the factors from *State v. Harper*, 2011-NMSC-044, ¶ 15, 150 N.M. 745, 266 P.3d 25, expounded upon in *Le Mier*: "(1) the culpability of the offending party, (2) the prejudice to the adversely affected party, and (3) the availability of lesser sanctions." 2017-NMSC-017, ¶ 15. Because the

district court chose not to sanction the State, we limit our review to the first two factors.

**{40}** The relevant facts are as follows. Defendant's original trial was set for June 17, 2021. The State had included "Dr. Samuel Kleinman, or [d]esignee" from the Scientific Laboratory Division in its witness list filed November 21, 2019, and intended to call Ms. Boyd to testify regarding the lab results of Defendant's blood alcohol content. The first trial, however, ended in a mistrial. Another discovery and scheduling order was issued on April 18, 2022, requiring witness lists to be filed ten days prior to the final pretrial conference. The pretrial conference was held on August 29, 2022—no witness list was filed prior to this conference and both parties stated that they were prepared for trial with no mention of the witness list.

**{41}** Defendant filed a motion to exclude the State's expert witness testimony on October 6, 2022—the day before trial—in which he referenced communications in the weeks leading up to trial where "the State represented that its contemplated witness for the laboratory would be unavailable to testify, and that it may attempt to obtain a different witness to lay the foundation for the laboratory results." Defendant alleged that on October 5, 2022, the State "contacted defense counsel representing that the laboratory witness was now available to testify and that the State would be calling Ms. Boyd." These communications are not included in the record. *See State*

*v. Hunter*, 2001-NMCA-078, ¶ 18, 131 N.M. 76, 33 P.3d 296 ("Matters not of record present no issue for review.").

**{42}** The district court heard argument on Defendant's motion to exclude the State's expert witness on the morning of trial. The State addressed each *Harper* factor and confirmed during argument that it had been unsure whether Ms. Boyd would be able to testify, but that it notified Defendant of its uncertainty, and then later as soon as it confirmed her availability. The district court denied Defendant's motion orally and in its written order stated, "This is a retrial after a mistrial. Same witness at prior trial. Witness was at the prior trial. Defense was prepared at prior trial."

**{43}** We first consider the level of culpability attributable to the State. *See Le Mier*, 2017-NMSC-017, ¶ 15. During its argument on the motion, the State asserted it was unsure whether an expert would be available to testify at Defendant's second trial, but the State had put defense counsel on notice that someone would likely testify from the Scientific Laboratory Division when it filed its witness list for the first trial. Once the State knew Ms. Boyd would be available for the second trial, it alerted defense counsel via email. The district court did not explicitly address culpability in its order, but we believe it implicitly found that the State was not sufficiently culpable, as it filed a witness list for the first trial and maintained contact with Defendant about the status of its witness.

{44} The second factor considers the prejudice to Defendant and the district court. *See id*. ¶¶ 15, 25-26. Defendant argues that he was prejudiced because he "would have prepared for trial differently had he known Ms. Boyd was going to testify as an expert and lay the foundation for the blood test results." However, as the district court noted in its order, Ms. Boyd was called to testify at Defendant's prior trial. Therefore, according to the district court, defense counsel should have already prepared to do an examination of the exact same witness and was not prejudiced by the district court's decision to allow the State's expert to testify.

{45} While the district court did not explicitly refer to *Harper* or *Le Mier* in its order, the court heard argument on the factors, and we believe it implicitly addressed the first two factors in its oral ruling and written order. The district court found that the State was not sufficiently culpable, because the State communicated the status of the expert witness to Defendant, and that Defendant was not sufficiently prejudiced, as he had the opportunity to prepare for the same witness at the prior trial. We conclude that the district court did not abuse its discretion because its decision was not "clearly untenable or not justified by reason," and we therefore will not disturb the court's order. *Le Mier*, 2017-NMSC-017, ¶ 22 (internal quotation marks and citation omitted).

**CONCLUSION**

{46} We reverse Defendant's conviction and remand for a new trial.

{47}    **IT IS SO ORDERED.**

_____
**ZACHARY A. IVES, Judge**

**WE CONCUR:**

_____
**KRISTINA BOGARDUS, Judge**

_____
**JANE B. YOHALEM, Judge**